# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

**RICHARD MARINO,**

Plaintiff,

- v -

Civ. No. 9:12-CV-1170
(GTS/RFT)

**DR. CARL J. KOENIGSMANN**, *Chief Medical Officer,*
**DR. CHARLES LEE**, *Medical Director, Shawangunk*
*Correctional Facility*, **DAVID HAIMES**, *R.P.A., Five*
*Points Correctional Facility*, **DR. DANIEL**
**WEINSTOCK**, *Medical Director, Five Points*
*Correctional Facility*, **JOHN LEMPKE**, *Former*
*Superintendent of Five Points Correctional Facility,*
**SUSAN CORDILEONE**, *Nurse Administrator,*
*Five Points Correctional Facility* (*formerly known as*
*"Jane Doe"*),

Defendants.

**APPEARANCES:**                                    **OF COUNSEL:**

**RICHARD MARINO**
Plaintiff, *Pro Se*
02-A-6601
Shawangunk Correctional Facility
P.O. Box 700
Walkil, NY 12589

**HON. ERIC T. SCHNEIDERMAN**          **KRISTEN M. QUARESIMO, ESQ.**
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

     *Pro se* Plaintiff Richard Marino brings this civil rights action, pursuant to 42 U.S.C. § 1983,

alleging that Defendants failed to provide him with constitutionally adequate medical treatment for

his fractured jaw.  Dkt. No. 4, Am. Compl.  Defendants move to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 28.  Plaintiff opposes the Motion.  Dkt. No. 29.  For the reasons that follow, we recommend that Defendants' Motion be **GRANTED** in part and **DENIED** in part.

## I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972).  The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice."  *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *See Retail Clerks Intern. Ass'n, Local 1625,*

*AFL-CIO v. Schermerhorn*, 373 U.S. 746, 754 n.6 (1963); *see also Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. at 697 (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

With this standard in tow, we consider the plausibility of Plaintiff's Complaint.

## II. DISCUSSION

### A. Background

On December 27, 2010, Plaintiff fell in his cell at Five Points Correctional Facility ("Five Points"), struck his head on a metal toilet fixture, fractured his jaw, lost several teeth, and was rendered unconscious. Am. Compl. at ¶ 2. The following morning, Plaintiff reported to sick call complaining of his injury and was seen by Defendant Haimes, a Physician's Assistant at Five Points. Despite Plaintiff's description of his injury, and the fact that his jaw was making "an audible clicking sound" when Plaintiff opened or closed it, Defendant Haimes did not conduct an examination of Plaintiff or take x-rays, denied him access to a physician, and instead, "merely recommended that [Plaintiff] see a dentist and refused to prescribe [him] any pain medication for his jaw." *Id.* at ¶ 17.

On or around February 17, 2011, after multiple visits to sick call complaining of pain and requesting a physician, Plaintiff met with Dr. Mewar,[1] a Dentist at Five Points. Dr. Mewar informed Plaintiff that he could not repair Plaintiff's teeth until after Plaintiff's jaw was fixed, and referred Plaintiff to an oral surgeon. *Id.* at ¶ 18. Approximately six weeks later, and still experiencing pain and difficulty eating and sleeping, on or around March 31, Plaintiff met with Dr. O'Kiefe, an Oral Surgeon. *Id.* at ¶ 19. X-rays were taken, *id.* at ¶¶ 21 & 27, and Dr. O'Kiefe diagnosed Plaintiff as suffering from "a left condylar fracture in his jaw," *id.* at ¶ 19. On April 1, Dr. Mewar submitted a referral for Plaintiff to see a specialist for hospital based oral surgery. No appointment was made however, until Dr. Mewar submitted a second request on or around April 9. *Id.* at ¶¶ 20 & 23.

---

[1] Neither Dr. Mewar nor any of the other outside physicians/specialists that Plaintiff identifies as having provided him with treatment are named as Defendants in this action.

Plaintiff also filed a grievance on April 1, explaining that he had suffered from a broken jaw and that he was not receiving adequate medical attention. *Id.* at ¶¶ 21–22. His grievance was denied by the Inmate Grievance Review Committee ("IGRC") on May 4, 2011, noting in part that Five Point's Nurse Administrator, Defendant Susan Cordileone, testified that Plaintiff "admit[ted] that it was two months before the grievant reported the problems." *Id.* at ¶¶ 15 & 27. Plaintiff appealed the decision to Five Point's Superintendent, Defendant Lempke, on May 5. *Id.* at ¶¶ 14 & 29. Defendant Lempke denied Plaintiff's appeal on May 12. *Id.* at ¶ 30.

On April 12, 2011, Legal Aid wrote to Defendant Lempke, on Plaintiff's behalf, inquiring into the delay in Plaintiff's medical care, particularly with regard to the delay in diagnosing and treating his jaw. Defendant Lempke responded on April 20, seeking a medical authorization from Plaintiff; he did not address the substance of Legal Aid's letter. *Id.* at ¶ 24. Legal Aid sent Defendant Lempke a second letter on April 21 informing him that Plaintiff's April 14 surgery referral had been canceled, that Plaintiff was in extreme pain, unable to eat hard foods, and inquiring as to when Plaintiff's surgery consultation would be rescheduled. *Id.* at ¶ 25.

On or around April 28, 2011, Plaintiff saw Dr. Boyd at Erie County Medical Center; Dr. Boyd assessed Plaintiff and recommended a CT scan and physical therapy. Defendant Haimes requested a CT scan on May 21, but never submitted a request for Plaintiff to receive physical therapy. *Id.* at ¶ 26. The CT scan was performed on May 24, and the reviewing doctor confirmed that Plaintiff suffered from "'a subacute left mandibular fracture just inferior to the mandibular condoyle,'" and recommended that Plaintiff follow up with a specialist; that referral was submitted on or around June 17. *Id.* at ¶ 32.

On June 13, 2011, Defendant Lempke responded to Legal Aid's April 21 correspondence

stating that "'with regard to [] Mr. Marino's alleged broken jaw, medical records indicate that there is no evidence of this. His records do indicate the presence of TMJ.'" *Id.* at ¶¶ 25 & 33. On or about June 23, Plaintiff met with Dr. Boyd who determined that "'there was low indication for operative [management],'" and suggested physical therapy. *Id.* at ¶ 34. Although a request for physical therapy was made, it was denied.[2] *Id.* On or about June 30, Legal Aid sent a letter to Defendant Koenigsmann, the Chief Medical Officer at the New York State Department of Corrections and Community Supervision ("DOCCS"), describing Plaintiff's accident, medical condition, and treatment history, and requesting that Plaintiff be evaluated by a specialist; Dr. Koenigsmann did not respond to this letter. *Id.* at ¶ 35.

Over the next two months, Plaintiff continued to suffer from pain and make sick calls. Then, on or around July 12, 2011, Defendant Haimes requested a consultation for Plaintiff with an ear, nose and throat ("ENT") specialist. *Id.* at ¶ 36. On or around August 10, 2011, Plaintiff met with Dr. Richard Kelly, an outside specialist. However, copies of Plaintiff's CT scans were not sent to Dr. Kelly, and therefore, he was unable to render a complete diagnosis. Instead, Dr. Kelly recommended that Plaintiff's CT scans be sent to Dr. Kellman, a different ENT specialist, and that Plaintiff should see Dr. Kellman for a subsequent followup visit. A request for a followup was submitted on August 12. *Id.* at ¶ 37.

Two months later, on or around October 11, Plaintiff had a followup appointment with Dr. Lindsay Sobin. However, Plaintiff's CT scans were not sent along with Plaintiff to the appointment.

_____

[2] It is unclear from Plaintiff's Amended Complaint who denied this request. However, Plaintiff has alleged that Defendant Weinstock, Five Points' Medical Director, "was responsible for reviewing and either approving or denying referrals made by his medical staff regarding Mr. Marino's medical care while Mr. Marino was incarcerated at Five Points[.]" Am. Compl. at ¶ 13.

Nonetheless, from her evaluation of Plaintiff and a review of the March x-rays, Dr. Sobin determined that Plaintiff had "'sustained mandible fractures back in December' and had not received 'appropriate follow-up to that point.'" *Id.* at ¶ 38. Dr. Sobin recommended that Plaintiff see Dr. Sherard Tatum for "'possible reconstructive surgery' as [Plaintiff] was 'outside the normal window for surgical intervention.'" *Id.* On or around November 21, 2011, Plaintiff met with a colleague of Dr. Tatum, Dr. David Craig, who noted that as a result of his fall, Plaintiff "'experience[s] malocclusion [(misalignment of the teeth resulting from a jaw fracture)], jaw pain, and a facial deformity in the form of a leftward jaw deviation and asymmetric left side of his face compared with the right.'" *Id.* at ¶ 39 (alterations in original). Dr. Craig further noted that Plaintiff's partial fracture was partially healed and that Dr. Tatum planned to operate. In the subsequent weeks, Defendant Haimes submitted several referrals and consultation requests for the recommended surgery. *Id.*

On or around December 5, 2011, Legal Aid sent Defendant Koenigsmann another letter, restating what had been communicated in its June 30 letter. *Id.* at ¶ 40. On or around December 19, Plaintiff met with Dr. Tatum for a pre-operation appointment. Dr. Tatum informed Plaintiff that:

> because of the delay in treatment, (i) full reconstructive surgery was needed and that surgery could not be performed from inside the mouth, but that large incisions from the temple to the jaw would need to be made; (ii) surgery would take six or more hours; and (iii) risks of the surgery were high, including a high risk of significant nerve damage resulting in facial paralysis. Dr. Tatum also informed [Plaintiff] that the risks and intrusive nature of the surgery could have been avoided if his fractured jaw had been timely diagnosed and treated, and that he would likely require additional surgeries beyond the initial surgery.

*Id.* at ¶ 41.

Although the reconstructive surgery was scheduled for December 29, 2011, it never occurred. *Id.* at ¶¶ 41–42. Rather, around 9:00 pm on the evening prior to the surgery, Plaintiff informed the infirmary nurse that he was feeling a slight cold. *Id.* at ¶ 42. At 10:00 am the following morning,

Defendant Haimes made note of the fact that Plaintiff's surgery had been postponed.  *Id.* at ¶ 43.

Although the surgery was not immediately rescheduled, Plaintiff was not placed on "medical hold,"

as is required pursuant to DOCCS policy.  *Id.* at ¶ 44.

On or around February 17, 2012, DOCCS transferred Plaintiff from Five Points to

Shawangunk Correctional Facility ("SCF").  *Id.* at ¶ 45.  On or around February 21, Plaintiff reported

to SCF's infirmary and was seen by Dr. Jon Miller.  Dr. Miller noted that Plaintiff was "in 'need of

maxillar repair due to malocclusion of the jaw[,]'" provided Plaintiff with pain medication, and

submitted a referral for an evaluation of his jaw.  *Id.* at ¶ 45.  On or around February 22, SCF's

Medical Director, Defendant Dr. Lee, saw Plaintiff in SCF's infirmary but refused to discuss his

treatment and referred Plaintiff back to Dr. Miller.  *Id.* at ¶ 46.  On or around February 28, Plaintiff

was seen by an outside ENT, Dr. Falk, who noted that he was "'not inclined to operate on this at this

time.'"  *Id.* at ¶ 47.  Instead, Dr. Falk recommended that Plaintiff "'maintain the relationship with

[the] prior surgeon who implemented a treatment plan.'"  *Id.*  On April 10, 2012, the medical

provider at SCF submitted a referral for Plaintiff to continue to receive care from Dr. Tatum;

however, the request was denied.[3]  *Id.*

On or around April 20, 2012, Legal Aid received a response from Defendant Koenigsmann

to their December 5 letter.  Defendant Koenigsmann claimed that he had not received medical

authorization, and thus did not respond substantively.  *Id.* at ¶ 48.  Plaintiff's Pro Bono Counsel,

---

[3] It is unclear from Plaintiff's Amended Complaint who denied this request.  However, Plaintiff has alleged that Defendant Dr. Lee Shawangunks' Medical Director, "was responsible for reviewing and either approving or denying referrals made by his medical staff regarding Mr. Marino's medical care while Mr. Marino was incarcerated at Shawangunk[.]" Am. Compl. at ¶ 13.

attorneys from the Weil, Gotshal Law Firm ("Weil")[4] also wrote to Defendant Koenigsmann on May 17, requesting "an update regarding the scheduling of Mr. Marino's surgery and any information that would demonstrate Mr. Marino is receiving the necessary and proper health care and services to treat his fractured jaw." *Id.* On July 3, 2012, Defendant Koenigsmann responded that Plaintiff's "'medical record has been reviewed thoroughly and the care rendered has been discussed by both the medical physicians and the dentists' . . . . that a new doctor . . . saw [Plaintiff] on June 8, 2012 and ordered an additional CT scan . . . which was taken on June 25, 2012. . . . [and] that [Plaintiff's] health care needs were 'being met.'" *Id.* at ¶ 50. Weil responded on July 19, informing Defendant Koenigsmann that Plaintiff's reconstructive surgery had not been rescheduled, reconstructive surgery had been indicated as early as March 31, 2011, Plaintiff's diagnosis had been confirmed by outside specialists and a CT scan, and Plaintiff was suffering as a result of his lack of treatment. *Id.* at ¶ 51. As of the writing of Plaintiff's Complaint on July 31, 2012, his reconstructive surgery had not yet been rescheduled. *Id.* at ¶¶ 43 & 52.

## B. Eighth Amendment

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.'" *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial

---

[4] Weil has since withdrawn its representation of Plaintiff, who now proceeds with this litigation *pro se*. *See* Dkt. No. 41, Text Order, dated Mar. 14, 2013.

of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The seriousness element, which is an objective test determining whether a deprivation of care is sufficiently serious, "entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at 279–80. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003); *see also Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one"). Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Smith v. Carpenter*, 316 F.3d at 185)). In such cases, courts "focus[] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.*

Plaintiff's allegations that he hit his head, causing him to fracture his jaw, loose three teeth and be rendered unconscious, in addition to his claims that he experienced severe pain and difficulty eating and sleeping, are more than sufficient to plausibly allege that he suffered from an objectively

*-10-*

serious underlying injury. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (noting that relevant factors in determining whether a condition is objectively serious include whether "a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals' daily activities; or the existence of chronic and substantial pain.").

In addition to his allegations that he was denied medical care, Plaintiff alleges that his medical care was unconstitutionally delayed. In analyzing Plaintiff's claims that his treatment was improperly delayed, our focus shifts from the seriousness of the underlying condition to whether the one-year and seven-month delay between the time when Plaintiff first sought medical attention and the date he filed his Amended Complaint, subjected him to a serious risk of harm. *See Salahuddin v. Goord*, 467 F.3d at 280; *Smith v. Carpenter*, 316 F.3d at 186. To that end, the Second Circuit has instructed us that "the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Smith v. Carpenter*, 316 F.3d at 187. In this regard, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* Determining whether the inadequacy/delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.*

Plaintiff asserts that although Defendants provided medical examinations, consultations with outside specialists, x-rays and CT scans, they failed to take relatively simple steps at the outset to diagnose and treat Plaintiff's fractured jaw, and as a result of the ensuing delay, his jaw healed

*-11-*

improperly resulting in disfigurement[5] and causing him to need a more extensive and risky form of reconstructive surgical treatment. *See, e.g.,* Am. Compl. at ¶¶ 2–5, 16, 53, & 58–63. Indeed, Plaintiff informs us that according to one of his treating physicians, Dr. Tatum, "because of the delay in treatment" Plaintiff must undergo full reconstructive surgery which could last six or more hours, requires large incisions to be made from the temple to the jaw, and carries a high risk of nerve damage and paralysis. Moreover, Dr. Tatum postulated that the intrusive nature of this reconstructive surgery as well as the increased risks associated therewith could have been avoided if his fractured jaw had been timely diagnosed and treated at the outset. *Id.* at ¶ 41. Such allegations are more than sufficient, at this early stage, to establish that the delay in treatment subjected Plaintiff to a significant risk of harm. *Cf. Chance v. Armstrong*, 143 F.3d at 702 (finding that a failure to provide treatment to deteriorating teeth which arguably could have been saved but for the delay in treatment and were ultimately extracted was a sufficiently serious delay to survive a motion to dismiss).

Yet, neither the denial of medical care nor the risk of harm posed by a delay in treatment alone are sufficient to state a claim under the Eighth Amendment. Plaintiff must also plausibly allege that each of the named Defendants was deliberately indifferent toward the treatment of the underlying condition, or the risk posed by the delay in treatment. Deliberate indifference is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, similar to criminal recklessness. *Wilson v. Seiter*, 501

---

[5] As explained by Plaintiff, his jaw "ossified so poorly that it resulted in a severe facial deformity. [H]is face is asymmetric due to the leftward deviation of the mandible and shortening of the mandible on the left side.' In other words, when [he] opens his mouth, his jaw immediately, and without control, drops down and to the left in a visibly displaced manner. [His] quality of life has significantly deteriorated as his jaw fracture causes him great pain, which affects his ability to eat a regular diet and sleep soundly, resulting in weight loss of at least thirty pounds." Am. Compl. at ¶ 4.

U.S. 294, 301-03 (1991); *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer*). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted). Prison officials act with deliberate indifference "when [they] 'know[] of and disregard[] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837).

Lastly, It is well settled that an individual cannot be held liable for damages under § 1983 merely because she holds a position of authority, but she can be held liable if she was personally involved in the alleged deprivation. The personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that

unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).

With these considerations in mind, we now analyze the allegations against each Defendant.

### 1. *Defendant Haimes*

Plaintiff alleges that Defendant Haimes: (1) denied him treatment on the morning after the accident; (2) failed to request, or timely request, treatments recommended by Plaintiff's treating physicians and specialists; and (3) failed to ensure that a medical hold be put on Plaintiff to prevent him from being transferred out of the facility before his surgery could be rescheduled. Am. Compl. at ¶ 12.

Defendant Haimes, a Physician's Assistant at Five Points, was the first person to see Plaintiff on December 28, 2010, the morning after he slipped in his cell and injured himself. Despite being told by Plaintiff that he struck his head on a metal bathroom fixture, lost three teeth, and was rendered unconscious, Defendant Haimes refused to examine him or refer him to an on-duty physician, and instead "merely recommended that Mr. Marino see a dentist." Am. Compl. at ¶¶ 2, 12, & 17. Providing Plaintiff with the benefit of every reasonable inference, it is certainly plausible that by ignoring Plaintiff's injuries and refusing to provide treatment or refer Plaintiff to a physician or dentist, Defendant Haimes acted with deliberate indifference towards Plaintiff's serious underlying condition.[6]

Likewise, Plaintiff has alleged that Dr. Boyd, an outside specialist who diagnosed Plaintiff's fractured left jaw, recommended that Plaintiff undergo physical therapy. Nonetheless, Defendant

---

[6] Although Defendant Haimes "recommended" that Plaintiff see a dentist, it does not appear that he made an actual referral for Plaintiff to see a dentist; indeed, Plaintiff alleges that he did not see a dentist at Five Points until February 17, 2011, and even then, only after making "multiple [additional] visits to sick call complaining of pain and requesting to see a physician." Am. Compl. at ¶ 18.

Haimes did not request physical therapy for Plaintiff. *Id.* at ¶¶ 26 & 34. The Second Circuit has "previously held that a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *See Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (citing *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987)).

Additionally, Plaintiff alleges that in the weeks following November 21, 2011, Defendant Haimes "submitted several referrals and consultation requests regarding scheduling surgery to fix [his] fractured jaw." Am. Compl. at ¶ 39. The surgery was initially approved and originally scheduled for December 29, 2011. However, due to complications, the surgery was "postponed," a fact which Plaintiff alleges that Defendant Haimes specifically made note of. *Id*. at ¶¶ 39 & 42–43. Despite Plaintiff's ongoing need, the surgery was not immediately rescheduled, and notwithstanding DOCCS policy, Defendant Haimes failed to place a "medical hold" on Plaintiff to prevent him from being transferred out of Five Points before his surgery could be rescheduled/completed. *Id.* at ¶¶ 43–44. On February 17, 2012, Plaintiff was transferred from Five Points to SCF; and as of the time of the filing of Plaintiff's Amended Complaint on July 31, 2012, Plaintiff's surgery had not been rescheduled. *Id.* at ¶¶ 44–45.

At least one court within the Second Circuit has found that an inmate sufficiently alleged an Eighth Amendment violation where he claimed that prison officials "intentionally impeded his access to medical care by, inter alia, transferring him from one facility to another just at the time that he was about to undergo medical treatment[.]" *Williams v. Dir. of Health Servs., Dep't of Corr. Servs.*, 542 F. Supp. 883, 885 (S.D.N.Y. 1982). And, although upon a fuller record Defendant Haimes's behavior may amount to nothing more than in-actionable negligence or medical malpractice, at this early stage, Plaintiff's allegations that Defendant Haimes ignored his request for

medical attention on the morning after his fall, ignored the specialists' recommendations for physical therapy, and failed to place Plaintiff on medical hold despite knowing his surgery had been postponed, are sufficient to plausibly allege that Defendant Haimes acted with deliberate indifference.

Accordingly, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's deliberate medical indifference claim against Defendant Haimes

### 2. Defendant Cordileone

Plaintiff alleges that Defendant Cordileone, Five Points' Nurse Administrator, (1) denied him adequate medical care by lying to the IGRC; and, (2) failed to ensure that a medical hold was placed on Plaintiff to prevent him from being transferred out of Five Points while his surgery was pending, resulting in further delays. Am. Compl. at ¶ 15.

Plaintiff claims that Defendant Cordileone was aware of his "medical treatment" as Nurse Administrator. However, Plaintiff makes only one factual allegation with regard to Defendant Cordileone's involvement in this case: he alleges that at a grievance hearing before the IGRC, regarding the delay in his treatment, Defendant Cordileone stated that Plaintiff "did admit that it was two months before he reported the problem." *Id.* at ¶ 15. Plaintiff's wholly conclusory allegation that Defendant Cordileone knew of his "medical treatment" is insufficient to plausibly establish that she was conscious of either the severity of his injury, or the risk posed by delaying his treatment. *See Howard v. Deuel*, 2011 WL 4829689, at *5 (W.D.N.Y. Oct. 12, 2011) (holding that plaintiff's conclusory allegation that the defendant had knowledge of a specific risk was insufficient to state a claim where plaintiff failed to allege facts from which it could plausibly be inferred that defendant actually knew of the risk). Thus, absent any indication that Defendant Cordileone was conscious of

the risks posed by denying or delaying his treatment, it is simply implausible to suggest that any of Defendant Cordileone's actions, be it lying to the IGRC, or failing to place Plaintiff on medical hold, were taken in deliberate indifference towards his condition. *See Perez v. City of New York*, 2013 WL 6182931, at *2 (S.D.N.Y. Nov. 21, 2013) (dismissing medical indifference claim where plaintiff failed to allege any "facts indicating that [defendants] knew of and disregarded *any* risk—let alone an excessive risk—of harm to plaintiff"); *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. at 837, for the proposition that to act with deliberate indifference a defendant must know of and appreciate the risk of harm posed by their actions); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Accordingly, while outright dismissal of Plaintiff's claim against Defendant Cordileone would certainly be warranted, we are cognizant that the Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se*] complaint gives any indication that a valid claim might be stated."). Therefore, while we find that Plaintiff has failed to state a claim upon which relief could be granted, in light of his *pro se* status, this Court recommends Plaintiff's Eighth Amendment Claim against Defendant Cordileone be **DISMISSED** but that Plaintiff be **GRANTED LEAVE TO AMEND** to cure the deficiencies described herein.

### 3. *Defendant Weinstock*

Plaintiff alleges Defendant Weinstock (1) denied and delayed requests for various treatments, and (2) failed to place Plaintiff on medical hold to prevent him from being transferred out of Five Points while he was waiting for his surgery to be rescheduled. *See* Am. Compl. at ¶ 13.

To begin with, we note that nothing in the Amended Complaint suggests that Defendant Weinstock was aware that Plaintiff's reconstructive surgery was postponed and needed to be rescheduled. Thus, it is implausible to suggest that Defendant Weinstock acted with deliberate indifference by failing to place a medical hold on Plaintiff. *See Perez v. City of New York*, 2013 WL 6182931, at *2; *see also Chance v. Armstrong*, 143 F.3d at 702.

However, according to Plaintiff, in his capacity as the Medical Director at Five Points, Defendant Weinstock was "responsible for reviewing and either approving or denying referrals made by his medical staff regarding [Plaintiff]'s medical care while [Plaintiff] was incarcerated at Five Points[.]" Am. Compl. at ¶ 13. Plaintiff further alleges that pursuant to the recommendation of one of the outside specialists who was treating him, Defendant Haimes submitted a request for physical therapy, but that request was denied.[7] *Id.* at ¶ 34. Prior to the issuance of the request for physical therapy, Dr. Mewar had submitted at least two prior requests for a consultation with an oral surgeon for Plaintiff's broken left jaw. *Id.* at ¶ 20. Given that Plaintiff has alleged Defendant Weinstock was personally responsible for approving or denying all such requests, it is plausible that Defendant Weinstock was conscious of the fact that Plaintiff was suffering from a sufficiently serious injury prior to receiving, and denying, the request for physical therapy. Thus, notwithstanding the fact that

---

[7] The precise date on which this request was issued is unclear from the Amended Complaint. *See, e,g,*, Am. Compl. at ¶¶ 26 & 34.

during his incarceration at Five Points, numerous requests for specialty consultations with outside doctors, diagnostic tests, and surgery were approved, it is still plausible that Defendant Weinstock acted with deliberate indifference when, despite being aware of the fact that Plaintiff suffered from a fractured jaw, he denied Plaintiff's request for physical therapy. *See Johnson v. Wright*, 412 F.3d at 404. Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Defendant Weinstock.

### 4. Defendant Lee

Plaintiff alleges that Defendant Dr. Lee, SCF's Medical Director, was responsible for approving or denying various requests from Plaintiff's treating physicians and specialists. Moreover, Plaintiff alleges that while acting in that capacity, Defendant Lee denied the recommendation of one of Plaintiff's treating specialists. Am. Compl. at ¶ 11.

Plaintiff was transferred from Five Points to SCF on or around February 17, 2012. *Id.* at ¶ 45. On February 21, Plaintiff saw the "medical administrator"[8] who "immediately" referred him to the facilities Doctor, Dr. Miller. *Id.* Dr. Miller prescribed pain medication to Plaintiff and submitted a request for an evaluation for repair of Plaintiff's jaw, "noting [Plaintiff's] 'history of mandibular fracture after sustaining a fall' and that he 'has been seen at otolaryngology specialist for reconstructive surgery.'" *Id.* Dr. Miller requested that the re-evaluation be conducted as soon as possible because Plaintiff's fracture was over a year old. *Id.* On February 28, Plaintiff met with Dr. Faulk, an otolaryngology specialist, who informed Plaintiff that "he was 'not inclined to operate . . . at this time.' . . . [and that Plaintiff should] 'maintain the relationship with the prior surgeon who implemented a treatment plan.'" *Id.* at ¶ 47. However, Defendant Lee denied a request to continue

---

[8] Plaintiff does not identify the "medical administrator" by name. *See* Am. Compl. at ¶ 45.

Plaintiff's care with his previous suregon. *Id.* Thus, Plaintiff has plausibly alleged that Defendant Lee was aware of the extent of Plaintiff's injury (from Dr. Miller's initial request for a re-evaluation), and despite his knowledge of Plaintiff's condition, Defendant Lee "deliberately ignore[d] the medical recommendations of [Plaintiff]'s treating physicians." *See Johnson v. Wright*, 412 F.3d at 404.

Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Defendant Lee.

### 5. *Defendant Koenigsmann*

According to Plaintiff, Defendant Carl Koenigsmann, DOCCS' Deputy Commissioner/Chief Medical Officer, (1) was aware of the ongoing violations of Plaintiff's constitutional right to adequate medical care, but failed to take action, and (2) failed to place Plaintiff on "medical hold." Am. Compl. at ¶ 10.

Plaintiff has alleged that both Legal Aid and Weil kept Defendant Koenigsmann well apprised of his condition and the delays in his treatment *via* written correspondence with Defendant Koenigsmann. *See id.* at ¶¶ 35, 40, 48, & 50. While Plaintiff has failed to allege that Defendant Koenigsmann knew of Plaintiff's impending transfer he has sufficiently alleged that Defendant Koenigsmann was aware of the fact that Plaintiff's surgery had not been rescheduled as late as July 2012, more than six months after it was initially postponed. Plaintiff claims that on May 17 and July 19, 2012 Weill notified Defendant Koenigsmann that Plaintiff's physicians had indicated that reconstructive surgery for his broken jaw was necessary, that the surgery was scheduled in December of 2011 but had to be postponed, and that it had not yet been rescheduled. *Id.* at ¶¶ 48 & 50–51. Defendant Koenigsmann responded that an "investigation" had been conducted and concluded that

*-20-*

Plaintiff's medical needs were being met. *Id.* at ¶ 51. Nonetheless, as of the filing of the Amended Complaint on July 31, 2012, Plaintiff's reconstructive surgery had still not been rescheduled. *Id.* at ¶ 52. While upon a fuller record, the actions taken by Defendant Koenigsmann may prove to have been sufficient, at this early stage, Plaintiff's allegations plausibly allege that Defendant Koenigsmann "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873.

Accordingly, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Defendant Koenigsmann.

### 6. *Defendant Lempke*

According to Plaintiff, Defendant Lempke, the Superintendent at Five Points during the time period relevant to this action, is liable for (1) approving Plaintiff's transfer to SCF despite his "ongoing medical issues and pending surgery[,]" Am. Compl. at ¶ 14, and (2) because despite being aware of facts suggesting an ongoing constitutional violation was occurring, Defendant Lempke failed to take proper steps to remedy the situation, *see* Dkt. No. 29, Pl.'s Opp'n, at p. 23.

Plaintiff has failed to allege a single fact from which it would be plausible to conclude that Defendant Lempke was aware that Plaintiff's December 29, 2011 surgery was postponed. *See generally* Am. Compl. Indeed, according to the Amended Complaint, the last contact between Defendant Lempke and Plaintiff or one of his representatives occurred on June 13, 2011, more than six months before his surgery was originally scheduled to take place. *See* Am. Compl. at ¶¶ 25 & 33.

However, Plaintiff has plausibly alleged that Defendant Lempke was aware of both his

underlying condition and the delays in his treatment. According to Plaintiff he filed an inmate grievance on April 1, 2011, explaining, *inter alia*, that his jaw was broken and he was not receiving adequate medical treatment for his condition, and requesting that he be provided with adequate care in the future. *Id.* at ¶¶ 21–22. On May 5, the grievance was denied and Plaintiff appealed the decision to Defendant Lempke, who denied Plaintiff's appeal on May 12. *Id.* at ¶¶ 29–30. Defendant Lempke noted that "'the investigation reveals that the grievant reported his jaw issue to Medical two (2) months after his alleged fall. On 12/28/2010, his range of jaw motion was normal." *Id.* at ¶ 30. Additionally, Plaintiff has alleged that Legal Aid wrote letters on his behalf to Defendant Lempke describing Plaintiff's condition and the delays in his treatment, and Defendant Lempke responded to those letters. *See, e.g.,* Am. Compl. at ¶¶ 24–25 & 33. Defendant Lempke's receipt of Plaintiff's grievance, the fact that he conducted an "investigation," and his correspondence with Legal Aid are more than sufficient to plausibly establish that he was personally involved in the denial/delay of treatment. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 430-31 (S.D.N.Y. 2010) (citing *Walker v. Pataro,* 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23, 2002) for the proposition that "personal involvement will be found only when a supervisory official 'receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint')"); *see also Watson v. Wright*, 2013 WL 1791079, at *9 (W.D.N.Y. Mar. 26, 2013) (citing *Mateo v. Fischer*).

Notwithstanding the sufficiency of Plaintiff's allegations, Defendants argue that Defendant Lempke is entitled to qualified immunity. Dkt. No. 28-1, Defs.' Mem. of Law, at pp. 18–20. The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Firzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng v. Coughlin*, 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id*. If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). As noted above, Plaintiff has sufficiently alleged a claim based on his right to receive adequate medical care under the Eighth Amendment. Moreover, the right to receive adequate medical care was clearly established at the time of the alleged violation. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Accordingly, Plaintiff must next demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley*, 261 F. Supp. 2d 113, 125 (N.D.N.Y. 2003) (citing, *inter alia*, *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d at 211); *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). The only pleadings filed in the present case thus far are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather in their memorandum of law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a . . . 12(b)(6)

*-23-*

motion for failure to state a claim upon which relief can be granted." *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (quoting *Green*). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y. 1998) (citing *Green v. Maraio*, 722 F.2d at 1019); *see also McKenna v. Wright*, 386 F.3d at 435.

The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002). For these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004).

Defendants argue that because Defendant Lempke, a non-medical professional, relied on the actions and opinions of medical personnel it was "objectively reasonable for him to believe that he had not acted with the requisite deliberate indifference." *Id.* at pp. 19–20. Such a conclusion naturally requires the determination of certain factual questions that cannot be answered at this early stage in the proceedings. For example, while Defendants maintain that Defendant Lempke relied on the actions and opinions of medical personnel, Plaintiff maintains that Defendant Lempke clearly ignored the medical records and the opinions of his treating physicians. Indeed, as late as June 13, 2011, Defendant Lempke stated in a letter that Plaintiff's medical records did not include any evidence of a broken jaw. Am. Compl. at ¶ 33. Yet, Plaintiff has alleged that his broken jaw was diagnosed on March 31, 2011, *id.* at ¶ 19, and confirmed by a separate outside specialist *via* a CT

scan on May 24, 2011, *id.* at ¶ 32.  Thus, any conclusion that Defendant Lempke's belief that his actions were objectively reasonable would be premature given the allegations before us.  And, while upon a fuller record, the actions taken by Defendant Lempke in response to these letters may prove to have been objectively reasonable, at present, it remains unclear.  Thus, because Plaintiff's allegations plausibly allege that Defendant Lempke "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring," *Colon v. Coughlin*, 58 F.3d at 873, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Defendant Lempke.

### III.  CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED in part and DENIED in part** as follows:

1. **GRANTED** as to Defendant Cordileone, with the proviso that Plaintiff be **GRANTED LEAVE TO AMEND** in accordance with the recommendations above; and
2. **DENIED** as to Defendants Haimes, Weinstock, Lee, Koenigsmann, and Lempke; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. §

636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date: February 25, 2014
      Albany, New York

_____
Randolph F. Treece
U.S. Magistrate Judge