UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD MARINO,

                 Plaintiff,

                                               9:12-CV-1170
v.                                         (GTS/DJS)

DR. CARL J. KOENIGSMANN, Chief Med. Officer;
DR. CHARLES LEE, Med. Dir., Shawangunk Corr.
Facility; DAVID HAIMES, RPA, Five Points Corr.
Facility; DR. DANIEL WEINSTOCK, Med. Dir.,
Five Points Corr. Facility; and JOHN LEMPKE,
former Superintendent of Five Points Corr. Facility,

                 Defendants.
_____

APPEARANCES:                               OF COUNSEL:

FRANZBLAU DRATCH, P.C.              BRIAN M. DRATCH, ESQ.
  Counsel for Plaintiff
233 Broadway, Suite 2701
New York, New York 10271

HON. ERIC T. SCHNEIDERMAN        JOSHUA E. McMAHON, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, Chief United States District Judge

## <u>DECISION and ORDER</u>

      Currently before the Court, in this prisoner civil rights action filed by Richard Marino

("Plaintiff") against the five above-named New York State correctional employees

("Defendants") pursuant to 42 U.S.C. § 1983, is Defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 68.)  For the reasons set forth below, Defendants'

motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

Generally, in his Amended Complaint, Plaintiff claims that, while an inmate at Five Points Correctional Facility and Shawangunk Correctional Facility, Defendants subjected him to deliberate indifference to his serious medical needs in violation of the Eighth Amendment. (*See generally* Dkt. No. 4 [Am. Compl.].)  More specifically, Plaintiff alleges that, on or around December 27, 2010, he fell in his cell, struck his head on a metal fixture, sustained a fractured jaw, lost several teeth, and was rendered unconscious. (*Id.* at ¶ 2.)  Plaintiff further alleges that, despite frequently receiving complaints from Plaintiff regarding his pain and suffering over the following year and a half, Defendants intentionally or recklessly failed to perform timely and necessary medical care and surgical intervention, and that, as a result, Plaintiff now requires "major reconstructive surgery" that otherwise could have been avoided. (*Id.* at ¶¶ 58-60.) Because this Decision and Order is intended primarily for the review of the parties, the Court will not recite in detail the remaining factual allegations of Plaintiff's Amended Complaint; rather, the Court refers the reader to the Amended Complaint. (*Id.*)

### B. Undisputed Material Facts

Except where otherwise noted, the following facts were asserted by Defendants and supported by an accurate record citation in their Rule 7.1 Statement and either expressly admitted by Plaintiff or denied without an accurate record citation in his Rule 7.1 Response. (*Compare* Dkt. No. 68, Attach. 10 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 74 [Plf.'s Rule 7.1 Response].)

<u>Parties and Background</u>

1.      Plaintiff has been an inmate in the custody and control of the

New York State Department of Corrections and Community Supervision ("DOCCS") since

December 2002.

2.      Plaintiff was incarcerated at Five Points Correctional Facility ("Five Points")

from on or about December 21, 2009, until on or about February 17, 2012.

3.      Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk") on

or about February 17, 2012.

4.      At all times relevant to this case, Plaintiff was incarcerated at Five Points

and Shawangunk.[1]

5.      At all times relevant to this case, Defendant Dr. Carl Koenigsmann ("Dr.

Koenigsmann") was the Deputy Commissioner and Chief Medical Officer for DOCCS.

6.      At all times relevant to this case, Defendant Dr. Charles Lee ("Dr. Lee") was the

Medical Director at Shawangunk.

7.      At all times relevant to this case, Defendant Dr. Daniel Weinstock ("Dr.

Weinstock") was the Medical Director at Five Points.

8.      At all times relevant to this case, Defendant John Lempke ("Lempke") was the

Superintendent of Five Points.

9.      At all times relevant to this case, Defendant David Haimes ("Haimes") was

---

[1]      During his deposition, Plaintiff testified that he was also briefly held at Auburn
Correctional Facility.  (Dkt. No. 68, Attach. 4, at 66-68 [Plf.'s Depo. Tr.].)

employed as a Certified Physician Assistant at Five Points.[2]

10.     Plaintiff has long suffered from lesions on his legs, which affect his ability to walk.

11.     Plaintiff also has a history of lower back pain, chronic left leg ulcers and pain, and osteomyelitis.

12.     Plaintiff has been treated for his back and leg pain with prescription medications including flexeril, baclofen, Ultram, and Tylenol.

13.     Between August 17, 2010, and December 28, 2010, Plaintiff was seen by medical personnel at Five Points on seventeen (17) occasions.

14.     Before Plaintiff was seen on December 28, 2010, medical records regarding these seventeen visits do not reflect that Plaintiff notified medical personnel that he had fallen or injured his jaw during the visits.  (Dkt. No. 69, Attach. 1, at DEF288-95 [Ambulatory Health Record ("AHR") Progress Notes].)

15.     Before being seen on December 28, 2010, medical records regarding these seventeen visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF288-95 [AHR Progress Notes].)

---

[2]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 9 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 9 [Plf.'s Rule 7.1 Response, stating that Plaintiff "can neither admit nor deny" portion of fact asserted, but admitting Haimes was employed at Five Points, and providing no record citation]; Dkt. No. 68, Attach. 7, at ¶¶ 1-2 [Haimes Decl.].)  *See also Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute.").

<u>Plaintiff's Jaw Injury</u>

16.     Plaintiff and Defendants disagree on the date on which Plaintiff fell and injured his jaw.  Defendants assert that Plaintiff injured his jaw in or around October 2010.  More specifically, according to Haimes (and based upon his contemporaneously created medical records), Plaintiff saw Haimes on December 28, 2010, related to a request to address his chronic low back pain.  (Dkt. No. 68, Attach. 7, at ¶ 8 [Haimes Decl.]; Dkt. No. 69, Attach. 1, at DEF295 [AHR Progress Note, dated 12/28/2010, identifying "chronic LBP" and "chronic lt leg pain"].)  Also according to Haimes, after Haimes addressed that issue, "almost as an afterthought," Plaintiff "complained of clicking in his jaw since falling in his cell and hitting the edge of a table two months previous" (i.e., in or around October 2010).  (Dkt. No. 68, Attach. 7, at ¶ 9 [Haimes Decl.]; Dkt. No. 69, Attach. 1, at DEF296 [listing subjective complaint as "clicking lower jaw. States he fell in cell 2 mo. ago [and h]it chin on edge of table].)  Moreover, Plaintiff asserts that he fell and struck his head "on a metal fixture" in his cell's "bathroom area" on the morning of December 27, 2010, and that he reported to sick call to "complain of [his] injury" the following day.  (Dkt. No. 17, Attach. 2, at ¶¶ 5-6 [Plf.'s Decl.].)[3]

17.     In any event, Plaintiff reported the injury on December 28, 2010.

18.     On that date, Plaintiff was seen by Haimes.

19.     During this appointment, Plaintiff complained of clicking in his lower jaw.

20.     According to Haimes, Plaintiff also stated that he had fallen in his cell two months earlier and hit his chin on the edge of a table.

---

[3]     During his deposition (taken almost two years *after* he executed his declaration), when asked if he fell on December 27, 2010, Plaintiff testified that it was "[s]omewhere [*sic*] around" that date that he fell and injured his jaw, but that he could not recall the exact date of the fall.  (Dkt. No. 68, Attach. 4, at 31 [Plf.'s Depo. Tr.].)  He further testified that he was advised by a corrections officer to report to sick call that morning (and did so).  (*Id.* at 34-35.)  According to Plaintiff, he saw a nurse, who observed a "bruise" and advised Plaintiff she would request that he be seen by a physician.  (*Id.* at 36.)

21.     Upon examination of Plaintiff, Haimes noted a bilateral click when Plaintiff opened and closed his jaw.

22.     Medical records regarding this visit do not reflect any complaint of pain or distress regarding Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF296 [AHR Progress Note].)

23.     At the conclusion of his appointment, Plaintiff was told to request an appointment with dental.[4]

24.     According to Plaintiff's expert, "[t]he standard of care in this state is for a mandible fracture to be treated within three to four days to get an optimal result with the bone segments in the proper position."

25.     According to Plaintiff's expert, a mandible fracture that is not treated within three to four days "will typically heal with the bone in the wrong position, which will result in a severe malocclusion, i.e., an inability for the teeth to touch on one side of the mouth when the jaws are in a closed position."

26.     According to Plaintiff's expert, Plaintiff has "been left with permanent sequelae" because corrective treatment was not rendered.

27.     After first complaining of clicking in his jaw, Plaintiff was seen by medical personnel at Five Points on December 29, 2010, and January 13, 2011, to renew his prescriptions and to request a consult for his chronic back and leg pain.

28.     Plaintiff did not complain of pain, distress, or discomfort in his jaw during these appointments.

29.     Plaintiff was seen by Haimes on January 28, 2011, complaining of continued issues with his left leg and lower back.

---

[4]     In his declaration, Haimes asserts that "Plaintiff was able to open and close his mouth well" and "did not mention jaw pain."  (Dkt. No. 68, Attach. 7, at ¶ 10.)  In light of those facts, and because "the injury was two (2) months old," Haimes advised Plaintiff "to drop a dental slip to see the dentist."  (*Id.*)

30. During this appointment, Plaintiff also complained of clicking and pain in his jaw.

31. Plaintiff also indicated that he had requested an appointment to see a dentist, but had not yet been called out.[5]

32. Haimes noted at the time that Plaintiff "needs [a] dental visit." (Dkt. No. 69, Attach. 1, at DEF299 [AHR Progress Note, dated 1/28/2011]; Dkt. No. 68, Attach. 7, at ¶ 15 [Haimes Decl.].)

<u>Plaintiff's Dental and Oral Surgeon Consultations and Prison Medical Visits</u>

33. On February 17, 2011, Plaintiff was examined by a dentist at Five Points for his complaints of clicking and pain in his jaw.[6]

34. At the conclusion of this appointment, Plaintiff was given a referral to see an oral surgeon. (Dkt. No. 74, Attach. 5 [Request & Report of Consultation, dated 2/17/2011, noting a referral to Dr. O'Kiefe scheduled for 3/31/2011].)

35. Thereafter, Plaintiff was seen by medical personnel at Five Points for prescription refills and continued treatment for his chronic left leg condition on the following dates: February 28, 2011; March 5, 2011; March 15, 2011; March 17, 2011; March 21, 2011; and March 26, 2011.

36. Plaintiff did not discuss his jaw, nor did he indicate that he was experiencing pain, distress, or discomfort, in his jaw, during these appointments.

37. On March 31, 2011, Plaintiff's jaw was examined by Dr. O'Kiefe, an oral surgeon.

---

[5] The summary judgment record does not clearly indicate how long after he was seen by Haimes that Plaintiff requested to see a dentist.

[6] According to medical records related to Plaintiff's dental consultation, submitted by Plaintiff in opposition to Defendants' motion, Plaintiff suffered a "self reducing TMJ [temporomandibular joint] dislocation on" his right side from an "allege[d] . . . fall about 4 months ago." (Dkt. No. 74, Attach. 5 [Request & Report of Consultation, dated 2/17/2011].) The same records noted that Plaintiff "has been missing all posterior teeth for many years" and that his "TMJ" may be "a chronic condition." (*Id.*)

38.     Dr. O'Kiefe took x-rays of Plaintiff's jaw, diagnosed Plaintiff with a left jaw fracture, and recommended that Plaintiff see a specialist.

39.     In accordance with Dr. O'Kiefe's recommendation, Plaintiff's dentist, Dr. Mewar, submitted a referral on April 9, 2011, for Plaintiff to be seen by a specialist.  (Dkt. No. 69 at DEF69 [Patient Referral Form, dated 4/9/2011].)

40.     On April 19, 2011, during sick call, Plaintiff was seen by medical personnel at Five Points for complaints of continued left leg pain and swelling.[7]

41.     At that appointment, a form was submitted at Plaintiff's request seeking approval for a soft foods diet.

42.     On April 28, 2011, Plaintiff was seen for an outside referral at Erie County Medical Center by Dr. Boyd, a specialist in oral surgery.

43.     Dr. Boyd noted that Plaintiff reported injuring his jaw in December 2010 when he fell and struck his face on a hard object.

44.     Dr. Boyd also noted that Plaintiff reported seeing a dentist at the time of his injury, and being examined by an oral surgeon on March 31, 2011.

45.     At the conclusion of this appointment on April 28, 2011, Dr. Boyd recommended that Plaintiff receive CT scans of his neck and face, as well as physical therapy to improve range of motion and pain reduction.

46.     Dr. Boyd stated that surgery on Plaintiff's jaw was not indicated at that time.

47.     On April 29, 2011, May 2, 2011, and May 5, 2011, Plaintiff was seen by medical personnel at Five Points.

---

[7]     A report related to this appointment also notes "c/o fractured jaw," but the "objective," "assessment," and "plan" portions of the report focus on Plaintiff's left leg, which was swollen; Plaintiff was advised to "elevate [his left] leg while in [his] cell to reduce swelling."  (Dkt. No. 69, Attach. 1, at DEF302.)

48. Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF303-04 [AHR Progress Notes].)

49. On May 10, 2011, Haimes noted that Plaintiff had been seen by Dr. Boyd at Erie County Medical Center on April 28, 2011, and that Dr. Boyd's recommendation that Plaintiff be sent for CT scans of his face had been approved.[8]

CT Scans of Plaintiff's Face and Plaintiff's Subsequent Diagnosis and Care

50. On May 24, 2011, Plaintiff underwent CT scans of his facial bones. (Dkt. No. 69 at DEF209.)

51. On May 26, 2011, and May 27, 2011, Plaintiff was seen by medical personnel at Five Points for prescription refills and continued treatment for his chronic left leg condition.

52. Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF305-06 [AHR Progress Notes].)

53. On June 2, 2011, Plaintiff was seen by Haimes for prescription refills and treatment for swelling in his left leg.

54. In a report dated June 7, 2011, Clifford D. Barker, M.D., indicated that Plaintiff's CT scans revealed a subacute left mandibular fracture inferior to the mandibular condyle.

55. Plaintiff was seen by medical personnel at Five Points for prescription refills on June 11, 2011, and June 21, 2011.

56. Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF306-307 [AHR Progress Notes].)

57. On June 23, 2011, Plaintiff was evaluated for a second time by Dr. Boyd at Erie County Medical Center, who discussed with Plaintiff the "significant surgical risks" and "low

_____

[8] The same record reflects that a CT scan of Plaintiff's neck, as well as physical therapy, was denied. (Dkt. No. 69, Attach. 1, at DEF304.) In his declaration, Haimes asserted that "APS" denied these services. (Dkt. No. 68, Attach. 7, at ¶ 21 [Haimes Decl.].)

benefit profile for invasive procedures" and recommended "non-surgical management," including physical therapy and a neurological evaluation. (Dkt. No. 74, Attach. 11 [Erie County Medical Center Progress Note, dated 6/23/2011]; *see also* Dkt. No. 69 at DEF68 [Consultant Report, noting "low indication for operative mgt."].)

58. On June 24, 2011, Plaintiff was seen by medical personnel at Five Points for prescription refills; Plaintiff did not discuss his jaw, nor did he indicate that he was experiencing pain, distress, or discomfort related to his jaw during this appointment.

59. On June 28, 2011, Plaintiff was examined by Haimes for complaints of numbness to the left side of his face.

60. On June 30, 2011, and July 1, 2011, Plaintiff was seen by medical personnel for prescription refills.

61. Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF308 [AHR Progress Notes].)

62. On July 12, 2011, due to "continued pain and difficulty chewing," Plaintiff was approved for a referral for an outside consultation with an otolaryngologist.

63. On July 12, 2011, Haimes also placed Plaintiff on a soft diet.

64. Thereafter, Plaintiff was seen by medical personnel for prescription refills and continued treatment for his chronic left leg condition on the following dates: July 28, 2011; July 29, 2011; August 2, 2011; and August 5, 2011.

65. Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF310-11 [AHR Progress Notes].)

66. On August 10, 2011, Plaintiff was examined at SUNY Upstate University Hospital in Syracuse, New York, by Dr. Richard Kelley, a specialist in otolaryngology.

67.     Thereafter, Plaintiff was seen by Five Points medical personnel for prescription refills, continued complaints regarding his chronic lower back pain, and continued treatment for his chronic left leg condition on the following dates: August 22, 2011; August 29, 2011; September 1, 2011; September 6, 2011; September 8, 2011; September 9, 2011; September 12, 2011; September 16, 2011; September 19, 2011; September 20, 2011; September 22, 2011; September 23, 2011; September 27, 2011; October 4, 2011; and October 11, 2011.  Moreover, plaintiff was also seen on August 25, 2011, at which time he inquired whether a follow-up appoint for his jaw had been scheduled.  (Dkt. No. 69, Attach. 1, at DEF313.)

68.     With the exception of the appointment on August 25, 2011, medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw. (Dkt. No. 69, Attach. 1, at DEF312-18 [AHR Progress Notes].)

Further Specialist Consultations and Discussions Regarding Reconstructive Surgery

69.     On October 11, 2011, Plaintiff was examined at SUNY Upstate University Hospital in Syracuse, New York, by a second specialist in otolaryngology, Dr. Lindsay Sobin.

70.     At that appointment, Dr. Sobin documented that Plaintiff has had malocclusion, trismus, and an inability to tolerate a regular diet since falling in his cell "approximately 1 year ago while incarcerated." (Dkt. No. 74, Attach. 13, at DEF47 [Outpatient Visit Report, dated 10/11/2011].)

71.     Dr. Sobin further noted that Plaintiff was outside of the normal window for surgical intervention and, as a result, recommended that Plaintiff be scheduled for a follow-up appointment to discuss the possibility of reconstructive surgery.

72.     On October 13, 2011, Plaintiff was seen by Five Points medical staff, at which time he claimed that he had fallen in his cell and "bumped the bridge of his nose on the sink/toilet area." Dkt. No. 69, Attach. 1, at DEF319 [AHR Progress Note].)

73.     Thereafter, Plaintiff was seen by medical personnel at Five Points for prescription refills and continued treatment for his chronic left leg condition on the following dates: October 14, 2011; October 20, 2011; October 21, 2011; October 24, 2011; October 28, 2011; October 31, 2011; November 10, 2011; November 14, 2011; November 15, 2011; November 17, 2011; and November 21, 2011.

74.     Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF319-24 [AHR Progress Notes].)

75.     On November 21, 2011, Plaintiff was seen in follow-up at SUNY Upstate University Hospital by a specialist in otolaryngology, Dr. David Craig.

76.     At this appointment, reconstructive surgery of Plaintiff's jaw was discussed, and Plaintiff was given "tongue blades" to use ten times per day until he had the procedure.

77.     Thereafter, Plaintiff was seen by medical personnel at Five Points for prescription refills and continued treatment for his chronic left leg condition on the following dates: November 22, 2011; November 28, 2011; November 29, 2011; December 5, 2011; December 8, 2011; December 12, 2011; and December 15, 2011.

78.     Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF 324-27 [AHR Progress Notes].)[9]

Scheduling of Reconstructive Surgery in December 2011

79.     On December 19, 2011, Plaintiff was seen by a specialist in facial reconstructive surgery, Dr. Sherard Tatum, at SUNY Upstate University Hospital in Syracuse, New York, for a pre-operation appointment.

_____

[9]     However, Plaintiff's medical record with regard to a visit on December 2, 2011, states that Plaintiff had a mandible fracture on the left side of his face.  (Dkt. No. 69, Attach. 1, at DEF325 [AHR Progress Notes].)  The record further states that Plaintiff was prescribed Imitrex, but provides no other information relative to his jaw.  (*Id.*)

80. At this appointment, Plaintiff was informed that cardiac clearance, as well as resolution of a staph infection in his left leg, would need to be obtained prior to surgery, which was scheduled for December 29, 2011.

81. On December 20, 2011, Haimes noted in Plaintiff's medical records that his left leg infection would need to be resolved before the surgery date of December 29, 2011. Haimes prescribed antibiotics for the infection.

82. On December 27, 2011, Plaintiff was seen by medical personnel at Five Points, complaining of cold symptoms, sore throat, nasal congestion, and cough.

83. On December 28, 2011, Plaintiff was seen by medical personnel complaining of headache, chills, cough, congestion, and diarrhea.

84. On December 28, 2011, Plaintiff was seen by cardiology and cleared for surgery. (Dkt. No. 69 at DEF138 [Central New York Cardiology Report, dated 12/28/2011].)

85. On December 29, 2011, Plaintiff was seen by Haimes complaining of loose stools, cold symptoms, chills, and upset stomach.

86. Upon further examination, Plaintiff was noted to be coughing yellow phlegm, and had a temperature of 99.5 degrees.

87. As a result, Plaintiff's scheduled surgery was canceled. (Dkt. No. 69, Attach. 1, at DEF332 [AHR Progress Note, dated 12/29/2011, signed by Haimes].)

Plaintiff's Care Until the Time of His Transfer to Shawangunk

88. Thereafter, Plaintiff was seen by medical personnel at Five Points for cold and flu-like symptoms, prescription refills, and continued treatment for his chronic left leg condition on the following dates: December 30, 2011; January 3, 2012; January 5, 2012; January 6, 2012; January 9, 2012; January 10, 2012; January 13, 2012; January 17, 2012; January 18, 2012; January 20, 2012; January 22, 2012; January 23, 2012; and January 25, 2012.

89.     Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF332-36 [AHR Progress Notes].)

90.     On January 26, 2012, Plaintiff was seen by medical personnel at Five Points and informed that his surgical appointment with Dr. Tatum could not be rescheduled until he had received clearance from the wound clinic that his leg infection had resolved.

91.     Thereafter, Plaintiff was seen by medical personnel at Five Points for prescription refills and continued treatment for his chronic left leg condition on the following dates: January 30, 2012; February 1, 2012; February 7, 2012; February 8, 2012; and February 14, 2012.

92.     Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF337-39 [AHR Progress Notes].)

93.     On February 15, 2012, Haimes noted in Plaintiff's medical records that Plaintiff was scheduled to be transferred to a different correctional facility on February 16, 2012.

94.     Haimes further noted that Plaintiff should be seen by the wound care clinic at his new facility for continued care on his chronic left leg condition.

95.     According to Haimes, Plaintiff's surgery had not been rescheduled as of February 15, 2012 because Plaintiff's left leg infection had not resolved.  (Dkt. No. 68, Attach. 7, at ¶ 32 [Haimes Decl.].)

96.     According to Haimes, Plaintiff was not on a medical hold as of February 15, 2012, because he had not yet been rescheduled for surgery.  (*Id.* at ¶¶ 31-33.)

97.     Haimes opined that transferring Plaintiff to a different correctional facility on February 16, 2012 "posed no risk to health."  (*Id.* at ¶ 34.)

Plaintiff's Transfer to, and Medical Care at, Shawangunk

98.     Plaintiff was transferred to Shawangunk on or about February 17, 2012.

14

99.     Plaintiff was initially examined by medical personnel at Shawangunk on February 17, 2012.

100.     On February 21, 2012, Plaintiff was seen by Dr. Jon Miller ("Dr. Miller") at Shawangunk for treatment of his chronic left leg condition and jaw.

101.     At that appointment, Dr. Miller prescribed Plaintiff pain medication for his jaw, and submitted a referral for an evaluation for surgery.

102.     On February 22, 2012, Plaintiff was seen by Shawangunk's Medical Director, Dr. Lee, who referred Plaintiff back to Dr. Miller for continued treatment.

Outside Specialist Referral on February 28, 2012

103.     On February 28, 2012, Plaintiff was examined at SUNY Upstate University Hospital in Syracuse, New York, by a specialist in otolaryngology, Dr. Arthur Falk.

104.     At that appointment, Dr. Falk indicated that he was not inclined to operate on Plaintiff's jaw, and that Plaintiff should return to see Dr. Tatum.

105.     Thereafter, Plaintiff was seen by medical personnel at Shawangunk for prescription refills and continued treatment for his chronic left leg condition on the following dates: March 1, 2012; March 5, 2012; March 8, 2012; and March 12, 2012.

106.     Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF346-49 [AHR Progress Notes].)

107.     On March 13, 2012, Plaintiff informed medical personnel at Shawangunk that Dr. Miller had instructed Plaintiff to report when he felt that he was ready to reschedule his jaw surgery.

108.     On March 23, 2012, Plaintiff was seen by medical personnel at Shawangunk complaining of jaw pain and asked to see Dr. Miller.

109.     On April 10, 2012, Plaintiff was referred for an appointment with an otolaryngologist at SUNY Upstate University Hospital in Syracuse, New York.

110.     This referral was subsequently denied because DOCCS had been informed that Dr. Tatum was no longer treating inmates.[10]

111.     Thereafter, Plaintiff was seen by medical personnel at Shawangunk for prescription refills and continued treatment for his chronic left leg condition on the following dates: April 12, 2012; April 16, 2012; April 19, 2012; April 23, 2012; April 30, 2012; May 3, 2012; May 29, 2012; and June 7, 2012.

112.     Medical records regarding these visits do not reflect any complaints regarding Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF352-54 [AHR Progress Notes].)

### Outside Specialist Referral, CT Scans, and Prison Medical Visits in June 2012

113.     On June 7, 2012, Dr. Lee approved Plaintiff's referral for consultation with an oral surgeon at Westchester Medical Center.

114.     On June 8, 2012, Dr. Frank Weber examined Plaintiff at Westchester Medical Center and recommended that new CT scans be obtained.

115.     On June 21, 2012, Dr. Lee approved Plaintiff's referral to Westchester Medical Center for CT scans of his jaw.

116.     On June 25, 2012, CT scans of Plaintiff's jaw were taken at Westchester Medical Center.

---

[10]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 114 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 [Plf.'s Rule 7.1 Response, asserting that Plaintiff can "neither admit nor deny" the factual assertion because he lacks "personal knowledge as to" Dr. Tatum's position regarding treatment of inmates, and setting forth no citation to the record where any factual dispute arises].)  *See also Davis*, 2015 WL 1413362, at *2.

117.    On July 9, 2012, Plaintiff was seen by medical personnel at Shawangunk for review of his CT scans; medical records related to that visit indicate that the CT scans revealed a left condylar fracture and a left temporal-mandibular dislocation.  (Dkt. No. 69, Attach. 1, at DEF359 [AHR Progress Note].)

118.    A follow-up consultation at Westchester Medical Center was also discussed at this appointment, which was later scheduled for August 10, 2012.

119.    In the interim, Plaintiff was seen by medical personnel at Shawangunk for prescription refills and continued treatment for his chronic left leg condition on the following dates: July 13, 2012; July 16, 2012; July 17, 2012; July 19, 2012; July 24, 2012; July 26, 2012; July 30, 2012; August 2, 2012; August 6, 2012; and August 7, 2012.

120.    Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 1, at DEF360-64 [AHR Progress Notes].)

<u>Outside Follow-Up Appointment and Prison Medical Visits in August 2012</u>

121.    On August 8, 2012, Dr. Lee approved Plaintiff's referral for a follow-up appointment regarding his jaw.  (Dkt. No. 69, Attach. 1, at DEF365 [AHR Progress Note].)

122.    On August 10, 2012, Plaintiff was seen by Dr. Weber at Westchester Medical Center for a follow-up appointment for his jaw.

123.    At that appointment, Dr. Weber recommended that Plaintiff undergo reconstructive surgery on his jaw.

124.    On August 21, 2012, Plaintiff was seen by medical personnel at Shawangunk and discussed both an upcoming cardiac procedure and the recommended reconstructive jaw surgery.

125.    Thereafter, Plaintiff was seen by medical personnel at Shawangunk on the following dates: August 29, 2012; September 5, 2012; September 7, 2012; September 11, 2012; September 18, 2012; September 20, 2012; and September 24, 2012.

126.    Medical records regarding these visits do not reflect any complaints regarding, or discussion of, Plaintiff's jaw.  (Dkt. No. 69, Attach. 2, at DEF511-14 [AHR Progress Notes].)

Approval for Further Outside Consultations and Scheduling of Reconstructive Surgery

127.    On September 26, 2012, Dr. Timothy Whalen approved Plaintiff to be evaluated again at SUNY Upstate University Hospital to determine whether another surgeon would be willing to perform Plaintiff's reconstruction.[11]

128.    Dr. Whalen was the Regional Medical Director for DOCCS' Albany Medical Center Region.

129.    Dr. Whalen became involved in Plaintiff's case in July 2012 due to difficulties in identifying a qualified surgeon willing to perform the surgery necessary to correct Plaintiff's jaw injury.[12]

130.    Specifically, although Plaintiff was evaluated for surgery by physicians at Albany Medical Center, Albany Memorial Hospital and Westchester Medical Center, none of the surgeons were willing to perform the procedure.[13]

---

[11]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 131 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 131 [Plf.'s Rule 7.1 Response, asserting that "Plaintiff can [*sic*] locate this document" without further explanation and without a record citation]; *accord,* Dkt. No. 26, Attach. 1, at ¶ 14 [Aff. of Dr. Timothy E. Whalen].)

[12]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 133 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 133 [Plf.'s Rule 7.1 Response, asserting that Plaintiff can "neither admit nor deny" the factual assertion because he lacks "personal knowledge" regarding the factual assertion, and setting forth no citation to the record where any factual dispute arises]; *accord,* Dkt. No. 26, Attach. 1, at ¶ 4 [Aff. of Dr. Timothy E. Whalen].)  *See also Davis*, 2015 WL 1413362, at *2.

[13]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 134 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 134 [Plf.'s Rule 7.1 Response, admitting the fact asserted and asserting additional fact neither asserted nor denied by Defendants, and without an accurate citation to the record]; *accord,* Dkt. No. 26, Attach. 1, at ¶ 13 [Aff. of Dr. Timothy E. Whalen].)  *See also Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'").

131.    On or about October 1, 2012, DOCCS and Dr. Whalen learned that, despite his prior reluctance to treat inmates, Dr. Tatum was now once again willing to perform Plaintiff's surgery.[14]

132.    On October 3, 2012, Dr. Whalen was informed that Plaintiff's surgery had been scheduled for November 29, 2012.[15]

133.    Dr. Whalen was also informed on October 3, 2012, that SUNY Upstate University Hospital staff had informed Plaintiff's counsel of Plaintiff's surgery date.[16]

134.    It is against DOCCS policy to disclose upcoming inmate medical appointments due to safety and security concerns.

---

[14]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 135 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 135 [Plf.'s Rule 7.1 Response, asserting that Plaintiff can "neither admit nor deny" the factual assertion because he lacks "personal knowledge" regarding the factual assertion, and setting forth no citation to the record where any factual issue arises]; *accord,* Dkt. No. 26, Attach. 1, at ¶ 15 [Aff. of Dr. Timothy E. Whalen].) *See also Davis*, 2015 WL 1413362, at *2.

[15]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 136 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 136 [Plf.'s Rule 7.1 Response, neither admitting nor denying the fact asserted and asserting that "Dr. Whalen's affidavit is self-serving and cannot be utilized to state an undisputed fact," without further explanation and with no citation to the record].) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("The record for purposes of the Statement of Material Facts includes . . . affidavits."); *Vail v. Smith*, 12-CV-0234, 2015 WL 792224, at *3 (N.D.N.Y. Feb. 25, 2015) (Suddaby, J., adopting Report-Recommendation of Treece, M.J.) ("[E]ven without supporting exhibits, an affidavit may suffice to enable a movant to meet its threshold burden on a motion for summary judgment.") (footnoted omitted); *Union Carbide Corp v. Exxon Corp.*, 77 F.3d 677, 682 (2d Cir. 1996) ("Standing alone, these declarations were more than sufficient to support summary judgment in favor of Exxon.").

[16]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 137 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 137 [Plf.'s Rule 7.1 Response, neither admitting nor denying the fact asserted and asserting that "Dr. Whalen's affidavit is self-serving and cannot be utilized to state an undisputed fact," without further explanation and with no citation to the record].) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("The record for purposes of the Statement of Material Facts includes . . . affidavits."); *Vail*, 2015 WL 792224, at *3; *Union Carbide Corp*, 77 F.3d at 682.

135.    On October 10, 2012, Plaintiff's surgery was canceled for safety and security reasons because the date had been disclosed to Plaintiff's counsel by SUNY Upstate staff.[17]

136.    Thereafter, Plaintiff was seen by medical personnel at Shawangunk on the following dates: October 12, 2012; October 31, 2012; November 6, 2012; November 7, 2012; November 8, 2012; November 9, 2012; November 13, 2012; November 14, 2012; November 15, 2012; November 19, 2012; November 20, 2012; November 22, 2012; November 23, 2012; November 25, 2012; November 26, 2012; November 27, 2012; November 28, 2012; November 29, 2012; December 3, 2013; December 4, 2012; December 5, 2012; December 6, 2012; and December 18, 2012.

137.    Medical records regarding these visits do not reflect any complaints regarding Plaintiff's jaw.  (Dkt. No. 69, Attach. 2, at DEF493-508 [AHR Progress Notes].)

### Plaintiff's Refusal of Leg Wound Care and Jaw Surgery

138.    On December 20, 2012, Plaintiff had several conversations with medical personnel at Shawangunk and (by telephone) with medical personnel at SUNY Upstate Hospital about rescheduling his reconstructive jaw surgery.

139.    During those conversations, Plaintiff verbally indicated that he was refusing to undergo the surgery.

140.    In addition, Plaintiff signed a refusal form in relation to the surgery.[18]

_____

[17]    (*Compare* Dkt. No. 68, Attach. 10, at ¶ 139 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 139 [Plf.'s Rule 7.1 Response, asserting that Plaintiff can "neither admit nor deny" the factual assertion because he lacks "personal knowledge" regarding the factual assertion, and setting forth no citation to the record where any factual issue arises]; *accord,* Dkt. No. 26, Attach. 1, at ¶¶ 16-17 [Aff. of Dr. Timothy E. Whalen].)  *See also Davis,* 2015 WL 1413362, at *2.

[18]    (Dkt. No. 69, Attach. 1, at 493 [AHR Progress Note, dated 12/20/2012].)  During his deposition, Plaintiff testified that, when he spoke with personnel at SUNY Upstate Hospital by phone, he conveyed that he was "not refusing the surgery," but that he was "not well" at the time, was losing weight, and had "infections in [his] legs."  (Dkt. No. 68, Attach. 4, at 63-64 [Plf.'s Depo. Tr.].)  Plaintiff also testified that he wanted to see Dr. Tatum again before any procedure was conducted because he had not seen Dr. Tatum for over a year and a half.  (*Id.* at 63.)

141.	Thereafter, Plaintiff was seen by medical personnel at Shawangunk on the following dates: December 21, 2012; December 22, 2012; December 23, 2012; December 26, 2012; December 29, 2012; December 30, 2012; and January 3, 2013.

142.	Medical records regarding these visits do not reflect any complaints regarding Plaintiff's jaw.  (Dkt. No. 69, Attach. 2, at DEF487-92 [AHR Progress Notes].).

143.	On January 4, 2013, medical personnel at Shawangunk spoke with Plaintiff about the current plan for rescheduling his reconstructive jaw surgery.

144.	Plaintiff was advised that he would need to be admitted for intensive wound care treatment to heal wounds that had developed on his leg prior to surgery.[19]

145.	During that appointment, Plaintiff advised medical personnel at Shawangunk that he planned to refuse admission and medical treatment.

146.	Plaintiff's medical records reflect that, on or about January 5, 2013, Plaintiff refused to be admitted for wound care and all further medical treatment.[20]

147.	On January 17, 2013, Defendants' counsel informed the Court and opposing counsel that, should Plaintiff again refuse to proceed with the scheduled reconstructive jaw surgery, all opportunity for Plaintiff to undergo the procedure would be lost.

148.	This conclusion was based, at least in part, upon the prior difficulties encountered in locating a surgeon willing to conduct the procedure.

149.	On January 22, 2013, Plaintiff received pre-surgical testing from medical personnel at SUNY Upstate Hospital for the repair of his jaw.

---

[19]	(*Compare* Dkt. No. 68, Attach. 10, at ¶ 148 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 148 [Plf.'s Rule 7.1 Response, denying the factual assertion "as stated" and setting forth no citation to the record].)

[20]	(*Compare* Dkt. No. 68, Attach. 10, at ¶ 150 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 150 [Plf.'s Rule 7.1 Response, denying the factual assertion "as stated," and providing record citation in support of factual assertion neither asserted nor denied by Defendants].)

150.     On January 28, 2013, Plaintiff was transported to Auburn Correctional Facility to be housed before his scheduled surgical procedure on January 31, 2013.

151.     On or about January 30, 2013, Plaintiff again refused to proceed with the scheduled reconstructive surgery for his jaw.[21]

152.     On that date, Plaintiff indicated that he had "conclusively decided that he [was] not going forward with the scheduled reconstructive surgery."

153.     On January 31, 2013, the Court granted Plaintiff's counsel's request to cancel Plaintiff's reconstructive surgery.  (Text Order, filed 1/31/2013.)

154.     On that date, the Court also directed Plaintiff's counsel file a letter request withdrawing his motion for a preliminary injunction (Dkt. No. 17), and to advise the Court as to whether Plaintiff intended to file a stipulation discontinuing the action (Text Order, filed 1/31/2013).

155.     Plaintiff's counsel filed a motion to withdraw Plaintiff's pending motion for a preliminary injunction (Dkt. No 37), and the Court granted that request on February 1, 2013 (Dkt. No. 38).

156.     On February 26, 2013, Plaintiff's counsel filed a motion to withdraw as counsel. (Dkt. No. 39.)

157.     Therein, Plaintiff's "decision[] to cancel his reconstructive jaw surgery" was cited as having rendered continued representation of Plaintiff "unreasonably difficult."

---

[21]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 155 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 155 [Plf.'s Rule 7.1 Response, denying the factual assertion "as stated," and providing record citation in support of factual assertion neither asserted nor denied by Defendants].)  During his deposition, Plaintiff testified that the reason for his refusal to undergo surgery was that he was not permitted to speak with Dr. Tatum about the risks of the procedure beforehand, and had not seen Dr. Tatum for a year and a half.  (Dkt. No. 68, Attach. 4, at 62-63, 67-68 [Plf.'s Depo. Tr.].)

158.     Haimes treated Plaintiff on at least nine (9) occasions, obtained referrals for Plaintiff to see multiple specialists in several medical fields, and arranged for Plaintiff to undergo reconstructive surgery on his jaw.[22]

159.     Dr. Lee examined Plaintiff in February 2012 on one occasion after Plaintiff was transferred to Shawangunk.

160.     At the end of that examination, Dr. Lee referred Plaintiff back to another physician at Shawangunk for further treatment.[23]

161.     Thereafter, Dr. Lee's involvement with Plaintiff's treatment for his jaw was limited to approving referrals for Plaintiff to attend medical appointments outside of Shawangunk.[24]

162.     Dr. Weinstock was not personally involved in diagnosing or treating Plaintiff's jaw condition.[25]

163.     Lempke was not personally involved in diagnosing or treating Plaintiff's jaw condition.

---

[22]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 163 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 163 [Plf.'s Rule 7.1 Response, denying the factual assertion "as stated" and setting forth no citation to the record].)

[23]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 166 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 166 [Plf.'s Rule 7.1 Response, admitting the fact asserted and asserting improper legal conclusion].) *See also Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3.

[24]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 167 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 167 [Plf.'s Rule 7.1 Response, admitting the fact asserted and asserting improper legal conclusion].) *See also Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3.

[25]     (*Compare* Dkt. No. 68, Attach. 10, at ¶ 169 [Defs.' Rule 7.1 Statement, supporting the above-listed factual assertion with an accurate record citation] *with* Dkt. No. 74 at ¶ 169 [Plf.'s Rule 7.1 Response, admitting the fact asserted and asserting improper legal conclusion].) *See also Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3.

**C.      Parties' Briefing of Defendants' Motion for Summary Judgment**

In support of their motion for summary judgment, Defendants assert seven arguments: (1) Plaintiff cannot establish deliberate indifference on the part of Haimes because (a) Plaintiff complained of jaw pain on only one occasion while at Five Points, (b) his claim that he was injured on December 27, 2010 is belied by the record, which reflects that he was injured in October 2010 and did not report the injury until two months later, (c) as a result, the "undue delay" in treatment was attributable to Plaintiff himself, not Haimes, (d) in any event, even if Haimes did provide inadequate medical care, there is no evidence that Haimes' conduct rose to the level of culpable recklessness, and (e) Haimes did not violate DOCCS policy by failing to place Plaintiff on a medical hold before he was transferred to Shawangunk in that the transfer posed no risk to Plaintiff's health and, in any event, his oral surgery was not rescheduled due to his unresolved leg infection; (2) Plaintiff cannot establish deliberate indifference on the part of Dr. Lee because (a) the actions taken by Dr. Lee–including his examination of Plaintiff and approval of referrals–constituted reasonable exercises of medical judgment, (b) Plaintiff's referral to Dr. Tatum was denied because Dr. Tatum was no longer treating inmate patients (and not because of Dr. Lee's deliberate indifference to Plaintiff's medical needs), (c) even if Dr. Lee's treatment did not coincide with the recommendations of other medical professionals, his actions or inactions did not rise to the level of deliberate indifference, and (d) the record does not support the conclusion that Dr. Lee consciously disregarded an excessive risk to Plaintiff's health or intentionally delayed his treatment; (3) Plaintiff cannot establish that Dr. Koenigsmann is subject to supervisory liability because (a) Defendants were not deliberately indifferent to Plaintiff's medical needs and there is thus no basis for imposing supervisory liability and (b) Dr. Koenigsmann was not personally involved in any alleged delays in diagnosing or treating

Plaintiff's jaw injury and did not treat Plaintiff; (4) Plaintiff cannot establish that Dr. Weinstock is subject to supervisory liability on the basis that he failed to place a medical hold upon Plaintiff because Plaintiff was properly transferred to Shawangunk and, even if the transfer was not proper, it did not result in any delay in care; (5) Plaintiff cannot establish that Lempke is subject to supervisory liability because (a) Plaintiff was properly transferred to Shawangunk and, even if the transfer was not proper, it did not result in any delay in care and (b) affirming the denial of Plaintiff's grievance, and relying on the judgments and opinions of medical personnel in so doing, did not establish that Lempke was personally involved in the Eighth Amendment violation alleged; (6) Defendants are entitled to qualified immunity because it was objectively reasonable for them to believe that the medical care and treatment afforded to Plaintiff was adequate; and (7) Plaintiff has withdrawn the request for injunctive relief set forth in his Amended Complaint. (Dkt. No. 68, Attach. 1, at 2-24 [Defs.' Memo. of Law].)

In opposition to Defendants' motion, Plaintiff asserts six arguments: (1) summary judgment with regard to Haimes is unwarranted because the record contains admissible evidence that Haimes (a) was aware of the seriousness of a fractured jaw and the urgency of obtaining immediate treatment, (b) did not examine Plaintiff upon his first complaint in December 2010, did not obtain x-rays, and did not ensure a timely appointment with "dental," (c) delayed ensuring that Plaintiff obtained a CT scan or was seen by an oral surgeon, (d) did not ensure that Plaintiff obtained recommended physical therapy as required by the oral surgeon, and (e) unilaterally cancelled Plaintiff's corrective oral surgery that was scheduled for December 29, 2011, despite the fact that Dr. Tatum was ready, willing, and able to perform the surgery on that date; (2) summary judgment with regard to Dr. Weinstock is unwarranted because, as the medical director at Five Points, Dr. Weinstock reviewed all of the referrals completed by Haimes but "did nothing to correct the constitutional violations that were occurring to [P]laintiff with

respect to his jaw" and "simply allowed [P]laintiff to continue to suffer" until Plaintiff was transferred; (3) summary judgment with regard to Lempke is unwarranted because (a) he wrote a "false" letter to Prison Legal Services in which he asserted that Plaintiff's medical records did not indicate that Plaintiff had a fractured jaw (an assertion belied by Plaintiff's CT scan), and (b) despite knowledge that Plaintiff had a fractured jaw, he took no action to ensure that Plaintiff was properly treated; (4) summary judgment with regard to Dr. Koenigsmann is unwarranted because, despite receiving correspondence concerning his jaw in December 2011, Dr. Koenigsmann did nothing to ensure that Plaintiff underwent surgery that month, did not respond to Plaintiff's letter until April 2012 when he was "threatened with litigation," and otherwise did not assist Plaintiff concerning his medical needs; (5) summary judgment with regard to Dr. Lee is unwarranted because, as the medical director at Shawangunk, Dr. Lee failed to return Plaintiff to Dr. Tatum for surgery, but instead referred him to other specialists, causing further delay; and (6) genuine disputes of material fact exist with regard to whether Defendants are entitled to qualified immunity in light of their failure to provide "urgent treatment" and care for Plaintiff's fractured jaw.  (Dkt. No. 75 at 9-14 [Plf.'s Opp'n Memo. of Law].)

In their reply, Defendants reiterate the arguments set forth in their memorandum of law-in-chief and, moreover, argue as follows: (1) the record evidence supports the conclusion that Plaintiff injured his jaw in October 2010 (and not the day before he saw Haimes on December 28, 2010), and, even if a genuine dispute regarding the date of injury exists, Haimes acted appropriately based upon Plaintiff's appearance and his ability to open and close his mouth; (2) an oral surgeon (Dr. Boyd) advised that surgery was not indicated and, in any event, Plaintiff himself later refused to undergo surgery; and (3) Dr. Lee's referral of Plaintiff to other specialists (as opposed to Dr. Tatum) did not constitute deliberate indifference to a serious medical need. (Dkt. No. 76 at 1-5 [Defs.' Reply Memo. of Law].)

## II.   RELEVANT LEGAL STANDARDS

### A.   Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" (citations omitted). *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. (citation omitted).

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[26]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal

---

[26]     Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[27]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## B. Legal Standards Governing Claim Deliberate Indifference to Serious Medical Needs Under the Eighth Amendment

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 25 [1993]).  Within that framework, "[t]he Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *accord, Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  However, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to

---

[27]       *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103-04).  In this context, a

prison official violates the Eighth Amendment only when two requirements are satisfied.

*Farmer*, 511 U.S. at 834.

### 1.      Objective Requirement–Serious Medical Needs

"The first requirement is objective: the alleged deprivation of adequate medical care must

be 'sufficiently serious.'"  *Salahuddin*, 467 F.3d at 279 (citation and internal quotation marks

omitted); *accord*, *Farmer*, 511 U.S. at 834.  Evaluation of the objective prong involves two

inquiries: (1) "whether the prisoner was actually deprived of adequate medical care," and (2)

"whether the inadequacy in medical care is sufficiently serious."  *Salahuddin*, 467 F.3d at 279-

80.

With regard to the first inquiry, because a prison official need only provide "reasonable

care," one who acts reasonably in response to an inmate's health risk "cannot be found liable

under the Cruel and Unusual Punishments clause."  *Id.* at 279-80 (quoting *Farmer*, 511 U.S. at

847).  "The word 'adequate' reflects the reality that '[p]rison officials are not obligated to provide

inmates with whatever care the inmates desire.'"  *Banks v. Annucci*, 48 F. Supp. 3d 394, 408-09

(N.D.N.Y. 2014) (Hurd, J.) (quoting *Jones v. Westchester Cnty. Dept. of Corrs. Med. Dept.*, 557

F. Supp. 2d 408, 413 [S.D.N.Y. 2008]).

With regard to the second inquiry, determining whether the alleged inadequacy was

"sufficiently serious" involves an examination of "how the offending conduct is inadequate and

what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467

F.3d at 280 (citation omitted).  If the unreasonable medical care alleged was a "failure to provide

any treatment" for the inmate's medical condition, courts examine whether the condition itself is

sufficiently serious.  *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003) ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.") (footnote omitted).  "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'"  *Salahuddin*, 467 F.3d at 280 (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 [2d Cir. 1998]); *accord, Rodriguez v. Manenti*, 606 F. App'x 25, 26 (2d Cir. 2015) (summary order); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists.") (citation omitted).  "A finding of a serious medical need 'is necessarily contextual and fact-specific,' and thus 'must be tailored to the specific circumstances of each case.'"  *Shenk v. Cattaraugus Cnty.*, 305 F. App'x 751, 753 (2d Cir. 2009) (summary order) (quoting *Smith*, 316 F.3d at 185).

However, "[i]n cases where the inadequacy is in the medical treatment given," as opposed to a complete absence of treatment, "the seriousness inquiry is narrower."  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than' [the inmate's medical condition]."  *Id.* (quoting *Smith*, 316 F.3d at 185).  "In other words, the Court asks 'whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation.'"  *Kidkarndee v. Koenigsmann*, 12-CV-0502, 2014 WL 1239319, at *14

(N.D.N.Y. Mar. 25, 2014) (Suddaby, J., adopting Report-Recommendation of Hummel, M.J.)
(quoting *Frank v. Cnty. of Ontario*, 884 F. Supp. 2d 11, 19 [W.D.N.Y. 2012]).

### 2. Subjective Requirement–Deliberate Indifference

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *accord, Daniels v. Williams*, 474 U.S. 327, 331-33 (1986) (explaining that "injuries inflicted by governmental negligence are not addressed by the United States Constitution"). "[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, equivalent to "subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280; *Smith*, 316 F.3d at 184. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280; *accord, Farmer*, 511 U.S. at 837-38 ("An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis."). Because this inquiry is subjective, "[p]rison officials may . . . introduce proof that they were not so aware, such as testimony that 'they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'" *Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 844). However, "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of

it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703.

## III.    ANALYSIS

### A.    Whether Plaintiff's Complaint Must Be Dismissed as Against Haimes

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 68, Attach. 1, at 4-11 [Defs.' Memo. of Law]; Dkt. No. 76 at 1-4 [Defs.' Reply Memo. of Law].) To those reasons, the Court adds two points.

First, with regard to Plaintiff's initial presentation of himself to Five Points medical staff for his jaw injury, Defendants argue that, on December 28, 2010, Plaintiff reported that he injured his jaw in October 2010 (and thus that approximately two months had passed before Plaintiff presented the injury to Five Points medical staff), and Plaintiff argues that he injured his jaw on December 27, 2010 (the day before he first reported the injury to Haimes). (Dkt. No. 68, Attach. 1, at 11-13 [Defs.' Memo. of Law]; Dkt. No. 75 at 12 [Plf.'s Opp'n Memo. of Law].)

At first blush, the dispute regarding Plaintiff's date of injury is not without materiality. Plaintiff obtained the opinion of an expert witness, Scott Goldstein, D.D.S., who, based upon a review of Plaintiff's medical records, concluded that Plaintiff's mandible fracture was "not diagnosed properly until five months after the accident." (Dkt. No. 68, Attach. 3, at 2 [Letter from Scott Goldstein, D.D.S., dated 1/9/2015].) Goldstein asserted that "[t]he standard of care in [New York S]tate is for a mandible fracture to be treated within 3-4 days to get an optimal result with the bone segments in the proper position." (*Id.*) Goldstein further asserted that, without timely treatment, "the bone will typically heal with the bone in the wrong position, which will

33

result in severe malocclusion, i.e., an inability for the teeth to touch on one side of the mouth when the jaws are in a closed position." (*Id.*)

In his declaration, Haimes agreed with Goldstein's assertion "that a mandible fracture that is not treated within three to four days can result in the bone healing improperly, which can result in malocclusion." (Dkt. No. 68, Attach. 7, at ¶ 13 [Haimes Decl.].) Haimes asserted that, if Plaintiff had advised medical personnel about his injury "at the time of his fall," then "it is entirely possible that different treatment options could have been employed to avoid some or all of the conditions in his jaw that he now claims to suffer from[.]" (*Id.* at ¶ 14.) Moreover, Haimes asserted that, when a patient presents himself complaining of jaw injury, Haimes obtains a history, completes a "physical exam," determines whether the patient can open and close his mouth, "palpate[s] the mandible and temporomandibular joints," and, if there is "a history of trauma, [he] may order imaging studies" such as an x-ray. (*Id.* at ¶ 11.) Haimes asserted that he followed this procedure on December 28, 2010, and that he referred Plaintiff to a dentist for evaluation "because Plaintiff indicated that he had sustained his jaw injury more than two months prior." (*Id.* at ¶ 12.) Thus, Haimes concurred with Goldstein regarding the limited window within which certain treatment options for a mandible fracture are viable, and characterized Plaintiff's alleged delay in reporting his fall as the primary impediment to proper treatment and the reason that he merely referred Plaintiff for a dental evaluation.[28]

---

[28]      As noted previously, Plaintiff allegedly also either "broke" or knocked out multiple teeth during the fall. (*See, e.g.,* Dkt. No. 68, Attach. 4, at 32 [Plf.'s Depo. Tr., in which Plaintiff testified that, when he fell, his "front teeth . . . broke in half"].) However, the medical records that concern his complaints related to his mouth refer almost exclusively to his jaw, and not any specific tooth-related pain. Some of Plaintiff's medical records also reflect that Plaintiff was missing several teeth for reasons apparently unrelated to (and preceding) his jaw injury. (Dkt. No. 74, Attach. 5 [Request & Report of Consultation, dated 2/17/2011].)

The Court agrees with Plaintiff that a genuine dispute of fact exists regarding the reported date of his jaw injury. *See, e.g.*, *Houston v. Wright*, 10-CV-1009, 2013 WL 5439826, at *10-11 (N.D.N.Y. Sept. 27, 2013) (Mordue, J., adopting Report-Recommendation of Treece, M.J.) (denying summary judgment on deliberate indifference claim where issue of fact existed as to whether plaintiff told defendant doctor about a cell infestation of cockroaches inasmuch as "[s]uch he-said, she-said, arguments cannot be determined on summary judgment because they require the type of credibility assessment that has been specifically reserved to the trier of fact.") However, even if Plaintiff's assertions are fully credited (i.e., that he suffered his jaw injury on December 27, 2010, that he conveyed this fact to Five Points medical personnel, and that Haimes' notation that the fall occurred two months earlier was therefore incorrect), for the reasons stated in Defendants' memoranda of law, the Court concludes that Haimes did not act with deliberate indifference, either when he first addressed Plaintiff's jaw injury or throughout Plaintiff's time at Five Points. (Dkt. No. 68, Attach. 1, at 12-15 [Defs.' Memo. of Law]; Dkt. No. 76 at 2-3 [Defs.' Reply Memo. of Law].)

Aside from Plaintiff's assertions that he fell the day before he saw Haimes, the record does not contradict Haimes' declaration and medical record related to that visit or otherwise support the conclusion that Plaintiff told Haimes that he was in pain, let alone substantial pain. (Dkt. No. 68, Attach. 4, at 37 [Plf.'s Depo. Tr., in which Plaintiff testified that Haimes opined that Plaintiff's jaw did not "look broken," but "badly bruised," and did not necessitate an x-ray]; Dkt. No. 74, Attach. 3, at ¶ 6 [Plf.'s Decl., in which Plaintiff asserted that he was seen by Haimes, "but was not permitted to see a physician or primary healthcare provider despite an

audible clicking sound when (his) jaw opened and closed"].)[29]  Haimes asserted that Plaintiff was "able to open and close his mouth well, but there was a click palpated" and that Plaintiff "did not mention jaw pain."  (Dkt. No. 68, Attach. 7, at ¶ 10 [Haimes Decl.].)  Based upon these undisputed facts, even if obtaining imaging of Plaintiff's jaw would have been indicated (under the standard of care as articulated by Plaintiff's own expert), Haimes' decision to advise Plaintiff to put in a request to see dental personnel, and not to order imaging at that point or expedite Plaintiff's dental consultation, constituted, at most, negligence, which is insufficient to support an Eighth Amendment claim.[30]  *Estelle*, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice[.]"); *accord, e.g., Palacio v. Ocasio*, 02-CV-6726, 2006 WL 2372250, at *11 (S.D.N.Y. Aug. 11, 2006), *aff'd*, 345 F. App'x 668 (2d Cir. 2009) ("Defendant Edano's decision not to x-ray Palacio's jaw and his failure to diagnose the fracture do not support a claim under 42 U.S .C. § 1983.  Viewed in a light most favorable to the Plaintiff, the record does not suggest that Edano evinced a culpable recklessness in the manner in which he diagnosed Palacio's injury. At most, the facts might support a claim of medical malpractice.").

Second, with regard to Haimes' conduct after Plaintiff's appointment of December 28, 2010, the record does not support the conclusion that the delays Plaintiff experienced in obtaining a diagnosis, treatment, or surgical intervention were occasioned by the deliberate

---

[29]    Indeed, in his opposition memorandum of law, Plaintiff does not argue that he complained of jaw pain to Haimes.  (Dkt. No. 75 at 2 ["The evidence . . . indicate(s) that Plaintiff . . . . presented to sick call and saw defendant Haimes on December 28, 2010 with complaints of clicking to his jaw due to an injury."]; *id.* at 9 ["Plaintiff presented to Haimes on December 28, 2010 complaining of clicking to his jaw."].)

[30]    Goldstein (Plaintiff's expert) did not offer a specific opinion regarding the clinical presentation reflected in the medical record of Plaintiff's visit to Haimes on December 28, 2010.

indifference of Haimes.  Plaintiff was seen by a dentist on February 17, 2011, who observed a "self[]reducing TMJ dislocation" on Plaintiff's right side and provided a referral to an oral surgeon, scheduled for March 31, 2011.  (Dkt. No. 74, Attach. 5 [Request & Report of Consultation, dated 2/17/2011].)  On that date, an oral surgeon (Dr. O'Kiefe) took x-rays, diagnosed Plaintiff for the first time with a left jaw fracture, and recommended that Plaintiff see a specialist.  (Dkt. No. 68, Attach. 10, at ¶ 41.)  Plaintiff's dentist (Dr. Mewar) submitted the referral for a specialist visit, and Plaintiff ultimately saw Dr. Boyd, a specialist in oral surgery at Erie County Medical Center, on April 28, 2011.  (*Id.* at ¶ 46.)  Although Dr. Boyd recommended that Plaintiff receive CT scans of his neck and face as well as physical therapy, he concluded that surgery was not indicated at that time.  (*Id.* at ¶¶ 49-50.)  While some time elapsed between those appointments, the record provides no basis for concluding that Haimes was responsible for those delays (or, for that matter, that they were the result of deliberate indifference on the part of Haimes).  *See, e.g., Pabon v. Goord* , 99-CV-5869, 2003 WL 1787268, at *11 n.8 (S.D.N.Y. Mar. 28, 2003) ("The record does indicate that this delay was not attributable to most of the Defendants in this action. Plaintiff's primary care providers . . . made numerous requests for specialty consults, and there is no evidence that they had any control over when these consults would be scheduled. Similarly, WCMC and the specialists who Plaintiff saw at WCMC, including Defendants Moore and Goldberg, had no control over when he was actually scheduled for an appointment.  The Court sees no basis in the record to attribute any notable lapses in Plaintiff's care to these Defendants."); *Burgess v. Champagne*, 08-CV-0725, 2011 WL 382203, at *7 (N.D.N.Y. Jan. 12, 2011) (Homer, M.J.), *adopted*, 2011 WL 381286, at *1 (N.D.N.Y. Feb. 3, 2011) (Sharpe, J.) (concluding that "[t]here is no evidence [that] the delay . . . in approving and then scheduling [a neurosurgery] consultation was due to any indifference or delay on"

defendant's part, and that three months was "a reasonable time frame for any individual patient seeking specialty medical services").[31]

The record reflects that, between January 2011 and February 2012 (when Plaintiff was transferred to Shawangunk), of the numerous times Plaintiff had interaction with Five Points medical personnel, Haimes saw Plaintiff only seven times,[32] including the scheduled date of surgery, at which time Plaintiff presented with a fever and cold symptoms.  (Dkt. No. 68, Attach. 7, at ¶¶ 15-16, 19, 21, 24-25 28.)[33]  The medical records indicate that Plaintiff complained of jaw

---

[31]     Moreover, the record demonstrates that, on January 26, 2012, Plaintiff was informed that his surgical appointment with Dr. Tatum could not be rescheduled until he had received clearance from the wound clinic that his leg infection had resolved.  The record does not reflect that this infection had resolved at any point before his transfer from Five Points to Shawangunk.  This medically based interference with any surgical intervention related to Plaintiff's jaw, while unfortunate, cannot fairly be attributed to Defendants.

[32]     The record reflects that Plaintiff was frequently seen and treated by medical personnel at Five Points, often in relation to his chronic leg condition.  As discussed more fully above in Part I.B of this Decision and Order, Plaintiff was undisputedly seen by Five Points medical personnel regarding various medical issues on at least 70 occasions between March 2011 and February 2012, and the records related to those visits do not reflect that he complained of, or otherwise discussed, his jaw.  While Plaintiff occasionally complained of jaw pain and inquired about the status of pending consultative appointments, the record does not support the conclusion that Haimes (or any of the Defendants) ignored or disregarded an excessive risk to Plaintiff's health.  *See, e.g., Webley v. Hartmann*, 03-CV-0596, 2005 WL 1520852, at *3 (N.D.N.Y. June 27, 2005) (Magnuson, J.); *Pocevic v. Tung*, 04-CV-1067, 2006 WL 680459, at *7 (D.Conn Mar. 14, 2006) (holding that "[e]ighteen isolated complaints of pain over a fifteen month period" was insufficient to demonstrate "constant kidney stone pain at any time while" defendant doctor "was his treating physician").  Additionally, while this fact plays no role in the Court's conclusion, the Court cannot but note that Plaintiff's unequivocal and conclusive decision not to undergo jaw surgery at all, reached in January 2013, appears to undercut Plaintiff's claims concerning the seriousness and urgency of his complaints of on-going suffering.

[33]     Plaintiff's assertion that Dr. Tatum was willing and able to complete the scheduled surgery, despite Plaintiff's undisputed illness, is supported only by an AHR Progress Note, dated December 29, 2011, the signatory of which is indecipherable.  (Dkt. No. 69, Attach. 1, at DEF332 [AHR Progress Note, dated 12/29/2011].)  This record notes that Plaintiff complained of "loose stools, cold symptoms, chills," upset stomach, and had a temperature of 98.6 degrees at that time (8:10 a.m.).  (*Id.*) The record further notes that Haimes was "notified," that someone had "spoken" with the surgeon, and that the surgeon was "ok" with "cold symptoms."  (*Id.*)  According to the record, Plaintiff "then reported he ate," and the medical records department was notified.  (*Id.*)  At 10:00 a.m., Haimes recorded that Plaintiff's temperature had risen to 99.5 degrees.  (*Id.*)  Plaintiff was given Tylenol for his symptoms. (*Id.*)  Haimes noted, "[we] will need to postpone his surgery," without clear reference to whether he alone (or someone else) reached that conclusion.  (*Id.*)  However, even if Haimes determined that Plaintiff's

pain on only two of those occasions, once in January 2011 (before he was diagnosed with a jaw fracture) and once in June 2011. (Dkt. No. 69, Attach. 1, at DEF298 [AHR, dated 1/28/2011, noting that Plaintiff was still awaiting a dental visit, despite the fact that Plaintiff had previously "(d)ropped a dental slip"]; *id.* at DEF307-08 [AHR, dated 6/28/2011, noting that Plaintiff complained of "numbness" on the left side of his face and neck, that his neck had a "good" range of motion, and that "APS" had previously denied physical therapy recommended by an oral surgery specialist]).[34] Based upon the nature and relative infrequency of Plaintiff's complaints as established in the record, as well as those reasons set forth in Defendants' memoranda of law, it cannot be reasonably said that Haimes' conduct amounted to the recklessness required to establish deliberate indifference under the Eighth Amendment.

### B. Whether Plaintiff's Complaint Must Be Dismissed as Against Dr. Lee

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 68, Attach. 1, at 15-20 [Defs.' Memo. of Law]; Dkt. No. 76 at 4 [Defs.' Reply Memo. of Law].) In addition to those reasons, the Court notes only that, in his opposition memorandum of law, Plaintiff's sole argument with regard to Dr. Lee is that Dr. Lee failed to "return [P]laintiff to Dr. Tatum" for further treatment, but instead "referred [him] to other specialists." (Dkt. No. 75 at 13 [Plf.'s

---

surgery should be postponed in light of his condition (and even if Dr. Tatum did not agree that cancellation was necessitated by "cold symptoms"), no reasonable juror could conclude that this medical decision constituted deliberate indifference for Eighth Amendment purposes. *See generally Moran v. Livingston*, 10-CV-6178, 2016 WL 93402, at *7 (W.D.N.Y. Jan. 7, 2016) ("'Determinations made by medical providers within their discretion are given a presumption of correctness when it concerns the care and safety of patients.'") (quoting *Mendoza v. McGinnis*, 05-CV-1124, 2008 WL 4239760, at *11 [N.D.N.Y. Sept. 11, 2008] [McAvoy, J., adopting Report-Recommendation of Peebles, M.J.]).

[34]     In July 2011, Haimes noted that Plaintiff had been approved to see a specialist for his jaw fracture, and, moreover, placed Plaintiff on a soft food diet. (Dkt. No. 68, Attach. 7, at ¶ 22.) However, Plaintiff requested that the soft food diet be discontinued three days later. (*Id.* at ¶ 23.)

Opp'n Memo. of Law].)  Even if Dr. Tatum was, at the time in question, willing and able to see Plaintiff, an inmate does not have the right to see the specialist of his choosing.  *See Jones v. Vadlamudi*, 13-CV-0025, 2015 WL 670474, at *6 (N.D.N.Y. Feb. 17, 2015) (McAvoy, J., adopting Report-Recommendation of Treece, M.J.) (rejecting plaintiff's argument that doctor acted with deliberate indifference when plaintiff was "not allowed to return to" a specialist he had previously seen for follow-up care, but was instead referred to other specialists).

### C.    Whether Plaintiff's Complaint Must Be Dismissed as Against Dr. Koenigsmann

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 68, Attach. 1, at 21-22 [Defs.' Memo. of Law]; Dkt. No. 76 at 4 [Defs.' Reply Memo. of Law].)  To those reasons, the Court adds the following analysis.

Plaintiff argues that Dr. Koenigsmann "was made aware of the problem" with respect to Plaintiff's treatment, inasmuch as he was sent correspondence in December 2011 and should have ensured that Plaintiff's surgery scheduled for December 29, 2011, was undertaken.  (Dkt. No. 75 at 12-13 [Plf.'s Memo. of Law].)  On December 5, 2011, a representative of the Legal Aid Society's Prisoner's Rights Project wrote to Dr. Koenigsmann to address two concerns, specifically, Plaintiff's need for a wheelchair and his need for treatment for his jaw.  (Dkt. No. 17, Attach. 56 [Letter, dated 12/5/2011].)  The letter recounted Plaintiff's treatment history and requested that Plaintiff be "evaluated by a specialist and that any treatment recommendations be followed."  (*Id.* at 2.)

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.

1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]). Consequently, supervisory officials may not be held liable based merely upon their position of authority. *Wright*, 21 F.3d at 501; *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). However, a supervisory official's personal involvement may be shown by evidence demonstrating that the official did the following: (1) "participated directly in the" constitutional violation complained of, (2) "after being informed of the violation through a report or appeal, failed to remedy the wrong," (3) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (4) "was grossly negligent in supervising subordinates who committed the wrongful acts," or (5) "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *accord, Henderson v. Fischer*, 12-CV-1704, 2015 WL 1413965, at *9-10 (N.D.N.Y. Mar. 18, 2015) (McAvoy, J., adopting Report-Recommendation of Dancks, M.J.).

In this case, Plaintiff argues only that, after the Legal Aid Society requested in writing that Plaintiff's jaw be properly evaluated, Dr. Koenigsmann failed to ensure that his surgery proceeded as scheduled on December 29, 2011. (Dkt. No. 75 at 12-13.) Dr. Koenigsmann's receipt of, and failure to respond to, this correspondence is insufficient to establish his personal involvement in Plaintiff's alleged constitutional deprivations. *See, e.g., Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) (holding that supervisory official "cannot be held liable on the sole basis that he did not act in response to letters of protest").[35] Accordingly, Dr.

---

[35] Here, there is no evidence that Dr. Koenigsmann received and/or read the letter (which was dated December 5, 2011) before the date of Plaintiff's scheduled surgery (i.e., December 29, 2011), or that, even if Dr. Koenigsmann did so, he failed to promptly refer the matter to a subordinate for appropriate investigation and action. More important, it is difficult to imagine how a high-ranking official in Albany such as Dr. Koenigsmann would have had sufficient opportunity–between the time on the morning of December 29, 2011, that Haimes recorded Plaintiff's temperature as 99.5 degrees in Five Points, and the time that morning that the decision was made to postpone that surgery–to learn of the temperature and order that Plaintiff's surgery proceed as scheduled despite it.

Koenigsmann is entitled to summary judgment.[36]

**D.      Whether Plaintiff's Complaint Must Be Dismissed as Against Dr. Weinstock**

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 68, Attach. 1, at 22 [Defs.'

Memo. of Law]; Dkt. No. 76 at 4 [Defs.' Reply Memo. of Law].)

**E.      Whether Plaintiff's Complaint Must Be Dismissed as Against Lempke**

After carefully considering the matter, the Court answers this question in the affirmative

for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 68, Attach. 1, at 22-23

[Defs.' Memo. of Law]; Dkt. No. 76 at 4 [Defs.' Reply Memo. of Law].)  To those reasons, the

Court adds only one point.

Plaintiff argues in a conclusory manner that summary judgment should be denied with

respect to Lempke because he responded to a letter from the Legal Aid Society and asserted that,

"[i]n regards to [Plaintiff's] alleged broken jaw, medical records indicate that there is no evidence

of this.  His records do indicate the presence of TMJ." (Dkt. No. 17, Attach. 53 [Letter, dated

6/13/2011].)  Plaintiff correctly notes that Lempke's assertion appears to have been inaccurate,

---

[36]      Dr. Koenigsmann wrote a letter in response four months later, in which he noted that he
could not "divulge specific health information" without a HIPAA release on file but that Plaintiff was
"receiving necessary health care and services" in accordance with DOCCS policies.  (Dkt. No. 17, Attach.
57 [Letter, dated 4/20/2012].)  The Legal Aid Society sent a follow-up letter and, in a reply letter dated
July 3, 2012, Dr. Koenigsmann noted that Plaintiff's "medical record ha[d] been reviewed thoroughly,"
his care had "been discussed with both the medical physicians and the dentists," and that Plaintiff's
"health care needs . . . are being met."  (Dkt. No. 17, Attach. 59 [Letter, dated 7/3/2012].)  Plaintiff's
argument concerning Dr. Koenigsmann's alleged involvement is limited to his receipt of correspondence
and alleged failure to act in December 2011 and makes no reference to this 2012 correspondence.  In any
event, even if this correspondence rendered Dr. Koenigsmann personally involved as of July 2012, the
Court agrees with Defendants that Dr. Koenigsmann is entitled to summary judgment for the alternative
reason that Plaintiff has not established any underlying constitutional violation in relation to his medical
care.  *Dubuque v. Nowicki*, 13-CV-1032, 2015 WL 3960909, at *8 (N.D.N.Y. June 24, 2015) (Suddaby,
J., adopting Report-Recommendation of Dancks, M.J.); *accord, Alston v. Bendheim*, 672 F. Supp. 2d 378,
388 (S.D.N.Y. 2009) (granting defendant's motion to dismiss because supervisory liability requires "a
constitutional violation [to] have occurred") (citing *Hernandez v. Keane*, 341 F.3d 137, 145 [2d Cir.
2003]).

inasmuch as Plaintiff was diagnosed with a fractured jaw in April 2011. (Dkt. No. 68, Attach. 10, at ¶ 41.) Nevertheless, Lempke's letter provides no basis for concluding that Lempke acted with deliberate indifference toward Plaintiff.

**F.      Whether, in the Alternative, Defendants Are Entitled to Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 68, Attach. 1, at 23-24 [Defs.' Memo. of Law]; Dkt. No. 76 at 4 [Defs.' Reply Memo. of Law].) As an alternative ground for dismissal, and based upon the same record evidence from which the Court concludes that Defendants' acts or omissions did not rise to the level of deliberate indifference, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity. *See, e.g., Soto v. Wright*, 11-CV-2289, 2013 WL 474291, at *7 n.9 (S.D.N.Y. Feb. 1, 2013), *adopted*, 2013 WL 754711, at *1 (S.D.N.Y. Feb. 28, 2013) ("Defendants are entitled to qualified immunity because Soto has not only failed to establish any constitutional deprivation, but 'no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'") (quoting *Ford v. McGinnis*, 352 F.3d 582, 597 [2d Cir. 2003]).

**G.      Whether Plaintiff Has Withdrawn His Request for Injunctive Relief**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 68, Attach. 1, at 24-25 [Defs.' Memo. of Law]; Dkt. No. 76 at 5 [Defs.' Reply Memo. of Law].) The Court would add only that, generally, the withdrawal of a motion for a preliminary injunction does not constitute the withdrawal of a request for a permanent injunction in a pleading. However, here, Plaintiff's declaration that he will not proceed with reconstructive surgery renders impossible his request for a permanent injunction. Moreover, because Plaintiff did not oppose this aspect of

Defendants' motion, Defendants' burden is lightened with regard to it. *See Rusyniak*, 2009 WL 3672105, at *1 n.1; *Este-Green*, 2009 WL 2473509, at *2 & n.3. Indeed, Plaintiff expressly withdraws his request for injunctive relief. (Dkt. No. 75 at 9 [Plf.'s Opp'n Memo. of Law].) Because Defendants' unopposed arguments have clear facial merit, Plaintiff is not entitled to injunctive relief.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 68) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 4) is **<u>DISMISSED</u>**; and it is further

**ORDERED** that the Clerk of the Court shall issue a Judgment for Defendants and close this action.

Dated: March 31, 2016
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge